## SALLIE E. RUSSELL v. WM. A. RUSSELL.

Middle Section.  August 7, 1926.

No petition for Certiorari was filed.

1. **Appeal and error. A bill of exceptions will not be considered by appellate court without the certificate of the clerk of the trial court.**
The mere physical presence of a bill of exceptions, or other document, in the files of the Court of Appeals, without the certificate of the clerk of the trial court is insufficient to authorize the appellate court to consider it as a part of the record of the case in the chancery court.

2. **Appeal and error. In an appeal in an equity case the appellate court may reverse the case in the absence of any evidence to support the decree.**
An appeal in an equity case vacates the decree of the trial court, and the case is opened for a re-examination in the appellate court on all questions legitimately arising upon the record, and in the absence of any evidence before the court to support the decree, it cannot be sustained.

3. **Appeal and error. Rule in equity case does not apply to divorce case.**
Parol testimony in a divorce suit in chancery must be preserved by a bill of exceptions, and the appellate court will presume, on appeal in such cases, that the appellant's decree was based on proper and sufficient evidence, in the absence of a bill of exceptions.

4. **Appeal and error. Appellate court may allow a suggestion of diminution of the record and grant a re-hearing at any time before the case is finally disposed of.**
Under the rules of the Court of Appeals, suggestions of diminution of the record should be made before the case is called for trial, but the rule contains a proviso that "a suggestion of diminution of the record, accompanied by a duly certified transcript of the admitted part or parts of the record, if presented to the court, before the case is finally disposed of, may be considered, if in the opinion of the court, justice so requires." A case is not "finally disposed of" until the disposition of a petition to re-hear, if one is seasonable filed.

5. **Appeal and error. In divorce cases, the appellate court is not confined to assignments of error made by counsel.**
Divorce cases are sui generis and the appellate court is allowed a wide latitude in ascertaining if the divorce was properly granted and may investigate and consider errors not pointed out in the assignments of error.

6. **Divorce. Courts can grant divorce only upon grounds prescribed by statute.**
In the United States, the causes for divorce are prescribed by statute and the courts have no inherent power to grant a divorce except upon the grounds prescribed. The courts should give full and fair effect to the statute prescribing causes of divorce, but they cannot go beyond them.

7. **Divorce. Divorce will not be granted upon the ground of adultery unless the evidence clearly shows the defendant guilty.**
Mere suspicion or circumstances of suspicion will not suffice. The circumstances must be such as would lead the guarded discretion of a reasonable and just man to no other conclusion. Where the circumstances singly or together admit of two interpretations, the interpretation in favor of innocence should be adopted.

8. **Divorce.** Abandonment and desertion are not available as causes of divorce on behalf of a wife where husband and wife are living apart by mutual consent.

In an action by the wife for divorce on the grounds of abandonment and desertion where the evidence showed that they were living apart by mutual consent, held that under the circumstances, desertion and abandonment are not available as causes of divorce.

9. **Divorce.** Cruel and inhuman treatment within the meaning of the Tennessee divorce laws is not confined to acts of physical violence.

Cruelty as a cause of divorce is the wilful, persistent causing of unnecessary suffering, whether in realization or apprehension, whether of body or mind, in such a way as to render cohabitation dangerous and unendurable.

10. **Divorce. Evidence.** Evidence held sufficient to justify divorce on ground of cruel and inhuman treatment.

Where defendant prior to his marriage had had a housekeeper with whom he was accused of living in adultery and where the wife and the housekeeper had a fight and the housekeeper was compelled to leave and afterwards, upon separating from his wife, the defendant again took the housekeeper and restored her to her original status, held that such an act was sufficient to entitle the plaintiff to divorce on the grounds of cruel and inhuman treatment.

11. **Divorce. Alimony.** Valid separation agreement fixing property rights between husband and wife will bar alimony.

Where a husband and wife agree to live apart and enter into a contract adjusting their property rights, based upon a valid consideration, held such a contract is a bar to the recovery of alimony.

12. **Contracts.** Separation agreements based upon valid consideration are legal.

Where husband and wife agree to live separate and apart and enter into a contract adjusting their property rights based upon a valid consideration, held such a contract is not illegal and will be up-held by the court.

13. **Divorce.** Divorce will not ordinarily terminate a separation agreement.

A separation agreement does not in general prevent either party from securing a divorce. A subsequent divorce will not ordinarily terminate the agreement unless it is so provided therein and upon such divorce being granted, the court has no right to interfere with the agreement against the will of the parties. It may however, require the parties to annul the agreement as a condition to allow alimony. The court granting the divorce may use the separation agreement as a basis of fixing the alimony but is not required to do so..

14. **Divorce.** Wife's attorney fees are not affected by a separation agreement.

A separation agreement held not to preclude a suit for divorce and the wife was therefore entitled to an allowance for her attorney fees.

Appeal from Chancery Court, of Hickman County; Hon. J. W. Stout, Chancellor.

Modified and affirmed.

Connor Bates, of Centerville, and W. A. Knight, of Nashville, for appellant.

Hughes, Hatcher & Hughes, of Columbia, Clagett & Pinkerton and Logan Beasley, of Centerville, for appellee.

FAW, P. J.    This is a suit for divorce, alimony and counsel fees, brought in the chancery court of Hickman County, by Mrs. Sallie E. Russell against her husband, Wm. A. Russell.

On final hearing, the chancellor decreed that the bonds of matrimony subsisting between complainant and defendant be absolutely and forever dissolved, and that complainant be vested with all the rights of an unmarried woman, and that her former name, Sallie E. Kelly, be restored to her. The chancellor further decreed that complainant recover of defendant the sum of $4000 as alimony, and that complainant recover of defendant, for the benefit of her solicitors of record, the further sum of $500 solicitors' fees, and that defendant pay all the costs of the cause. The defendant filed a petition for a rehearing below which was dismissed by the chancellor at defendant's cost.

Defendant appealed from the decree of the court granting to complainant a divorce a vinculo upon the grounds stated in the decree, and in awarding to complainant alimony in the sum of $4000, and solicitors' fees in the sum of $500, and the costs of the cause, and in adjudging that complainant recover same from the defendant, and the defendant was allowed sixty days from the date of the decree in which to prepare and file his bill of exceptions, execute bond, and otherwise perfect his appeal. Defendant executed and filed an acceptable appeal bond in less than ten days from the date of the aforesaid decree.

An opinion has been heretofore handed down by this court, and a decree entered here, affirming the decree of the chancery court upon the ground that the assignments of error all depended upon the proof heard by the chancellor, the major portion of which consisted of the oral testimony of witnesses, and that it did not appear from the transcript certified to this court, that the evidence in the case had been preserved by bill of exceptions.

A volume containing two-hundred and fifty-one type-written pages, the contents of which indicated that it was a bill of exceptions in the case of Sallie E. Russell v. Wm. A. Russell, and which bore inherent evidence that it was an original bill of exceptions and not a transcript of a bill of exceptions, had been passed to the court along with the certified transcript, but which was not attached thereto nor referred to therein nor in any manner certified as a part of the transcript of the record in this case. It was held that the clerk & master is the legal custodian of the records of the chancery court, and a transcript duly certified by him is the only medium through which this court can know the contents of a record in the chancery court; hence the mere physical presence of a bill of exceptions, or other document, in the files of this court, without the certificate of the clerk of the trial court, is insufficient

to authorize us to consider it as a part of the record of the case in the chancery court.

Within ten days after our former opinion and decree, the Appellant Wm. A. Russell filed a petition for a rehearing, which petition contains, among others, the averments, in substance, that a bill of exceptions, duly authenticated, was seasonably filed below, and that, at the time when the clerk & master of the chancery court of Hickman county certified the transcript of the technical record in the cause, he also certified a transcript of said bill of exceptions as a part of the record; but the clerk & master by mistake, oversight or inadvertence, forwarded to the clerk of this court the original bill of exceptions, instead of the transcript thereof.

Petitioner filed, as an exhibit to his petition to rehear, a bill of exceptions bearing a proper certificate, over the signature and official seal of the clerk & master of the chancery court of Hickman county, of the same date as the certificate to the transcript of the technical record, and prayed for a rehearing, with leave to suggest a diminution of the record in order to make said certified transcript of the bill of exceptions a part of the record of the cause in this court.

Petitioner also asserts, respectfully, in his petition, that the former decree of this court was erroneous, for the reason that complainant was not entitled to an affirmance without proof. The predicate of the argument of counsel in support of appellant's contention just stated is (1) that errors in divorce cases may be revised only by "appeal" (Shan. Code, sec. 4890), and (2) such cases are, in their essential nature, chancery proceedings (Francis v. Francis, 3 Hig., 469); so that it is argued Section 4887, Shan. Code, governs divorce cases, and they are tried de novo in the appellate court.

It is true that an appeal in an equity case vacates the decree of the trial court, and the case is opened for a re-examination in the appellate court on all questions legitimately arising upon the record, and in the absence of any evidence before the court to support the decree, it cannot be sustained. Hearst v. Proffit, 115 Tenn., 560, 91 S. W., 207; State ex rel. v. Colored Tennessee Industrial School, 144 Tenn., 182, 231 S. W., 544.

But the rule just stated does not apply to divorce cases. It was distinctly held in the case of Goodman v. Goodman, 127 Tenn., 501, 155 S. W., 388, that parol testimony in a divorce suit in chancery must be preserved by a bill of exceptions, and the appellate court will presume, on appeal in such case, that the appellant's decree was based on proper and sufficient evidence, in the absence of a bill of exceptions.

It is further insisted, through the petition to rehear and the supporting brief, that, at any rate, this court erred in overruling ap-

pellant's fourth, fifth and sixth assignments of error, which assignments challenged that part of the appellant's decree granting alimony to the appellee. This latter insistence is based upon the theory that the decree for alimony depended upon a proper construction of certain exhibits to pleadings filed in the cause, all of which appear in the transcript of the technical record. But from an examination of the pleadings and the exhibits mentioned, we think it is obvious that it was legally possible for the proper construction of said exhibits, and their effect upon the rights of the parties in this case, to be controlled and determined by extraneous evidence. We therefore assumed, in the absence of a transcript of the evidence, that there was sufficient proof before the chancellor to support his decree on the subject of alimony, as well as the matter of divorce. We are satisfied that there was no error in our former opinion and decree in this cause, when tested by the record in this court at that time.

However, we think that, upon the facts now appearing, it would be proper to grant a rehearing in order that the record may be perfected and the appellant have a hearing upon the merits of the case. Under our Rules (151 Tenn., p. 817), suggestions of diminution of the record should be made before the case is called for trial, but the Rule contains a proviso that "a suggestion of diminution of the record, accompanied by a duly certified transcript of the omitted part or parts of the record, if presented to the court before the case is finally disposed of, may be considered, if in the opinion of the court, justice so requires."

In contemplation of the Rule just stated, as we have heretofore construed it in numerous instances, a case is not "finally disposed of" until the disposition of a petition to rehear, if one is seasonably filed. It is, therefore, within our discretion to grant the petition for a rehearing and allow a suggestion of a diminution of the record at this stage of the case. Gaut v. Wimberley, 99 Tenn., 496, 42 S. W., 265. But, as the duly certified transcript of the bill of exceptions accompanies the petition to rehear, it is not necessary that a writ of certiorari issue to the chancery court in order to bring up the omitted portion of the record. Hinton v. Insurance Co., 110 Tenn., 113, 121, 72 S. W., 265. The certified bill of exceptions has been marked filed by the clerk of this court, and it will be treated as a part of the record for consideration on the appeal.

When we come to the merits of the case, the first question for consideration is, whether the chancery court erred in granting complainant a divorce a vinculo on the pleadings and proof in the record? If it were proper to treat as waived all errors not assigned and supported by brief according to the rules governing assignments of error (151 Tenn., p. 816), our inquiry on this branch of the

present case would be greatly limited, for the reason that the three assignments of error which challenge the decree granting a divorce to complainant are limited in their scope. These assignments are as follows:

1. The court erred in finding and holding that in an altercation which occurred between the complainant and one Rose Berry, on defendant's farm on Beaver Dam Creek in Hickman county, Tennessee, defendant failed to interfere as early as he might, and in time to prevent the serious consequences resulting from the difficulty, and that his failure to do so amounted to, and was, such cruel and inhuman treatment toward the complainant as to entitle her to a divorce on this ground. (Bill of Exceptions, p. 233.)

2. The court erred in granting the complainant a divorce on the ground of cruel and inhuman treatment and indignities, predicated upon the findings of the court set out and referred to in Assignment I. (T. R. Tr., page 26.)

3. The court erred in granting the complainant a divorce on the grounds that the defendant utterly failed to provide for her, for the reason that this ground was not sufficiently set out in the pleadings, and is without evidence in the record to support it. (T. R. Tr., page 26.)"

We are of the opinion that the failure of defendant to interfere at an earlier stage of the "difficulty" or "altercation" between complainant and Rose Berry (mentioned in the first assignment, supra) did not constitute such cruel and inhuman treatment as would entitle complainant to a divorce from the bonds of matrimony.

We are also of the opinion that the record does not afford a basis for the .grant of a divorce on the ground that defendant failed to provide for complainant.

But we have not confined our investigation and consideration of this case to the propositions pointed out by the assignments of error. Divorce cases are sui generis. "It has been said by the courts and eminent writers on the subject that such action is really a triangular proceeding, to which the husband and the wife and the State are parties. When an attempt is made through the courts to undo a marriage, the State becomes in a sense a party to the proceedings, not necessarily to oppose but to make sure that the attempt will not prevail without sufficient and lawful cause shown by the real facts of the case, nor unless those conditions are found to exist at the time the decree is made on which the State permits a divorce to be granted. Both the policy and the letter of the law concur in guarding against collusion and fraud, and it should be the aim of the court to afford the fullest possible hearing in such matters." 9 R. C. L., p. 253. "The public has a direct interest both in the con-

tract and its dissolution. . . . The legal representative of the State, it is true, cannot, in divorce cases, interpose as a party on behalf of the public, but the court before whom an application for a divorce is tried is bound, under our statutes, to see that all the substantial provisions of law are complied with before it is authorized to dissolve the conjugal relation." Swan v. Harrison, 2 Cold., 534, 540-541.

In view of the principles just stated, we have endeavored to ascertain whether the decree dissolving the marriage contract between complainant and defendant is supported by the record. "In the United States the causes for divorce are prescribed by statute, and the courts have no inherent power to grant a divorce except upon the grounds prescribed." 19 Corpus Juris, p. 36. This principle is recognized in Tennessee. The courts should "give full and fair effect" to our statutes prescribing causes of divorce, but "cannot go beyond them." Rutledge v. Rutledge, 5 Sneed, 554, 558.

In her bill, complainant makes allegations, with specifications of time, place and circumstances, upon which she seeks to predicate four separate statutory causes of divorce, viz: (1) That defendant has committed adultery with one Rose Berry; (2) that defendant has been guilty of such cruel and inhuman treatment or conduct towards complainant as rendered it unsafe and improper for her to cohabit with him and be under his dominion and control; (3) that defendant has offered such indignities to the person of complainant as to render her condition intolerable and has thereby forced her to withdraw, and (4) that defendant has abandoned complainant, or turned her out of doors, and refused or neglected to provide for her.

The defendant answered the bill and denied, categorically, each and all of the charges contained therein which, if true, would afford a cause for divorce.

The decree of the chancellor, upon the pleadings and proof, is in these words:

"This cause came on to be heard on this February 1, 1924, and on previous days of the present term of this court, before Chancellor J. W. Stout, upon the bill of the complainant Sallie E. Russell, and the answer of the defendant Wm. Andrew Russell, and the depositions on file, and the oral testimony of witnesses examined in open court.

## I.

It does not satisfactorily appear to the court that the charge of adultery contained in the bill is proven by such satisfactory facts as to warrant a decree for divorce on that ground. Divorce on that ground is denied.

It does, however, satisfactorily appear to the court from the proof that the other grounds of divorce charged in the bill are satisfactorily proven, and that the facts charged in the bill with reference thereto are true; that the defendant had been guilty of such cruel and inhuman treatment and conduct toward complainant as rendered it unsafe and improper for her to cohabit with him and be under his dominion and control, and that he had offered such indignities to her person as rendered her condition intolerable, and had utterly failed and refused to provide for complainant, all without justification.

## II.

It is, therefore, ordered, adjudged, and decreed by the court that the bonds of matrimony subsisting between the complainant and defendant be absolutely and forever dissolved, and that complainant be vested with all the rights of an unmarried woman, and that her former name, Sallie E. Kelly, be restored to her.

## III.

It is further ordered, adjudged, and decreed that complainant retain her property which the defendant has returned to her and not be required to turn over to defendant under the marriage contract or otherwise any of her property.

Complainant is also given as alimony the sum of four thousand dollars ($4000) and the defendant will pay Jno. H. Clagett, Logan Beasley, and Hughes, Hatcher & Hughes, solicitors of complainant, the sum of five hundred dollars ($500) as their fees in the cause for services to this date, and defendant will pay the costs of this cause, and it is further ordered, adjudged and decreed by the court that complainant have and recover of the defendant said sum of $4000, and said sum of $500 for the use and benefit of said solicitors, together with the costs of this cause, for all of which let execution issue.''

The defendant filed a petition for a rehearing which was denied and dismissed by the chancellor within thirty days after the entry of the aforesaid decree, and ''from the judgment of the court granting and awarding to the complainant a divorce a vinculo, upon the grounds stated in the decree, and allowing and awarding to her alimony in the sum of $4000, and solicitors' fees in the sum of $500, and all the costs of the cause, and adjudging that she have and recover the same from the defendant, as shown by said decree, to which he excepted at the time; and from the judgment of the court refusing his petition to rehear, and dismissing the same at his cost, to which he excepted,'' the defendant prayed, obtained and perfected an appeal to this court.

The assignments of error and the argument on behalf of the defendant-appellant seem to proceed upon the assumption that the chancellor did not find that the defendant had been guilty of any cruel and inhuman treatment of complainant, except that defendant's failure to interfere sooner in the fight between complainant and Rose Berry was such cruel and inhuman treatment towards complainant as entitled her to a divorce. This assumption of defendant's counsel is predicated on a recital which follows the evidence in the case and appears only in the bill of exceptions, and which is as follows:

"After the conclusion of the evidence and argument of counsel, the court in disposing of the case said, in substance:

" 'In this case the court is of the opinion, and finds, that the charge of adultery made in the complainant's bill is not sustained by the proof, and that she is not entitled to a divorce on that ground.

" 'The court finds, however, that an altercation occurred between the complainant and one Rose Berry, at the home of the defendant on his farm on Beaver Dam Creek in Hickman county, Tenn., in the presence of the defendant, and that the said Rose Berry was the aggressor in said difficulty, and that she threw two rocks at complainant, and advanced on the complainant with a piece of timber, a fence or paling slat, and that defendant failed to interfere and prevent the difficulty, and failed to interfere until the parties had clinched, and the complainant had secured the advantage, and failed to interfere until he was called upon to do so by the said Rose Berry, and while it was proper for him to interfere when he did, the court is of the opinion, and so finds, that he might have interferred earlier, and in time to prevent the serious consequences resulting from the difficulty, and that his failure to do so amounted to, and was, such cruel and inhuman treatment toward the complainant as entitles her to a divorce on this ground.' "

Aside from the oral statement just quoted from the bill of exceptions, the decree before quoted contains the only findings of fact made by the chancellor. It is obvious that the statement last quoted was merely fragmentary. It does not purport to contain all the facts found by the chancellor when he decided the case and pronounced his decree.

On the contrary, after finding, in his decree, that the charge of adultery is not proven, the chancellor finds that "the other grounds of divorce charged in the bill are satisfactorily proven, and that the facts charged in the bill with reference thereto are true." It is necessary, therefore, to look to the complainant's bill, if we would know the "grounds of divorce" which the chancellor found to be supported by the proof.

We will not now undertake to make, in this written opinion, an analysis of the pleadings · and proof. They are voluminous, and much of the proof is salacious and nauseous to a degree that impels us to refrain from discussing it here. The record has been read and re-read. Parts of it have been read many times. The case has been the subject of repeated conferences between the members of the court, and it has been a difficult matter to reach satisfactory conclusions on some points.

Before stating our conclusions, it will be well to give, in brief outline, a statement of certain facts disclosed by the record. Some of the facts we are about to state are undisputed, and we find that the others, although disputed, are supported by the greater weight of the evidence.

Complainant and defendant were married on September 20, 1921, in Hickman county, Tennessee, were they both resided then, theretofore and since. At the time of their intermarriage, defendant was about sixty years of age and complainant about forty years of age. Defendant was a widower and had two daughters—one about seventeen years of age and another two or three years younger.

Complainant's intermarriage with defendant was her third matrimonial venture. Her second husband, L. M. Kelley, had died about one year before her marriage to defendant.

Defendant is a farmer, and, at the time of his marriage to complainant, he owned a farm on Beaver Dam Creek, ten or twelve miles from the town of Centerville, a tract of land in the "Duck River Bottom," and a dwelling house in Centerville. Defendant's two daughters, in charge of an elderly woman (Mrs. Bates) as housekeeper, lived in the aforementioned house owned by defendant in the town of Centerville. Defendant had a dwelling house on his Beaver Dam farm where he lived the greater part of his time, and where he had in his employ, as cook and housekeeper, a woman named Rose Berry, who had lived in defendant's home, as a servant, since her childhood and for a period of years ante-dating, in its beginning, the death of defendant's first wife. Rose Berry was the mother of an illegitimate child at the time of the intermarriage of complainant and defendant—a small boy at that time—and another illegitimate child was born to her within a year thereafter.

Complainant and her second husband, L. M. Kelley, conducted a small grocery store in Centerville, for seven or eight years before Kelley's death, and complainant continued to operate said store thereafter. Upon the death of L. M. Kelley, complainant became the absolute owner of personal property approximating, $14,000 in value, and consisting mainly of Government bonds, War Saving stamps and solvent notes, in addition to the small stock of groceries,

all of which she owned at the time of her marriage to the defendant.

Complainant was living in a part of the building in which she conducted her grocery store, and in which she and her former husband (Kelley) had lived. After she was married to defendant, complainant continued to live at the same place and conducted the grocery store, and defendant lived the major part of his time at his Beaver Dam farm-home, but usually spent his ''weeks-ends'' with complainant; that is, he would frequently stay with complainant at her home in Centerville from Saturday until Monday, and then return to his farm on Beaver Dam. This manner of living by complainant and defendant continued until May 16, 1922, and, in the interim, complainant had made a few (probably three or four) brief visits to defendant's home on Beaver Dam Creek.

On May 16, 1922, complainant employed the owner of a garage in Centerville to take her to defendant's farm-home. At complainant's request, the driver permitted her to alight from the automobile at a point some distance from defendant's dwelling house and on the opposite side of the creek, from which point the automobile returned to Centerville and complainant walked to defendant's house where she arrived about eleven o'clock in the forenoon without previous notice to defendant. Complainant demanded of defendant that he send Rose Berry and her child away from his place, and, during that afternoon, Rose and all her belongings were loaded onto a wagon and taken to the home of her brother, several miles distant. However, when the wagon was almost loaded, there was a verbal altercation, followed by a fight, between complainant and Rose Berry. Complainant, by making accusations of unchastity against Rose Berry, was the aggressor in the verbal quarrel, in the course of which complainant used numerous indecent, obscene and offensive epithets in her denunciation of Rose Berry. Seemingly goaded by the accusations and epithets thus uttered by complainant, Rose Berry threw two rocks at complainant. The two rocks missed complainant, and thereupon Rose Berry attempted to strike complainant with a chestnut paling, about three or four feet long, but complainant seized the paling, wrenched it from Rose's hands, threw it to the ground, and, drawing Rose's head against her bosom was moving towards a gate with the avowed purpose of ''butting her damned brains out against the gate post,'' when defendant intervened and put an end to the combat between complainant and Rose Berry.

When the fight began, defendant was helping to load some furniture on the wagon, which was standing near the gate and just outside the yard. The combatants were inside the yard and near the same gate. While complainant was drawing Rose Berry

towards the gate post as before stated, Rose with her hands in complainant's hair, was struggling with complainant, but (evidently realizing that complainant was her superior in physical strength) Rose called out to defendant, "Cap, make her quit; if you don't I'll go upstairs and get the shot gun and shoot her damned brains out." Immediately after this appeal and threat from Rose, defendant reached the struggling women and told them to "quit," whereupon Rose abandoned the conflict and attempted to withdraw, but complainant would not release her hold on Rose. Defendant caught complainant's hands and pulled them out of Rose's hair, which released Rose and she (Rose) made no effort thereafter to renew hostilities. Complainant then said to defendant, "turn my hands loose," and defendant replied that he would do so if she would "behave,"—evidently meaning that he would release her hands if she would nŏt renew the fight with Rose Berry. Complainant continued to struggle in an effort to free herself from defendant's grasp,—declaring that when she got loose she would "kill the whole dam push"—until she lost her balance and fell to the ground. Complainant's fall was caused by the heel of her shoe becoming fastened between two large rocks in a walkway. When complainant fell, in the manner above stated (with the high heel of her right shoe wedged tightly between two rocks), the bones of her right leg were broken at the ankle.

Defendant with the assistance of others present, carried complainant in the house, placed her on a bed, and telephoned for Doctors Beasley and Edwards of Centerville, who promptly responded to the call and made an examination of complainant's injuries. Upon advice of the physicians, complainant was taken, in an automobile, to the office of Doctors Beasley and Edwards in Centerville, where an X-ray picture of the broken limb was made and proper treatment administered, and complainant was then taken to her home. Defendant rode with complainant and held her injured limb on the trip from his Beaver Dam place to the Doctor's office in Centerville and then went with complainant to her home and nursed her and attended to her wants for many weeks, and until the broken bones had knitted and complainant was going about on crutches, and until complainant and defendant separated by mutual consent on August 8, 1922, in the manner hereinafter more fully stated.

On the above mentioned trip from defendant's Beaver Dam place to Centerville, complainant used very abusive language towards defendant and applied vile epithets to him, but defendant made no retort in kind and, at least outwardly, ignored complainant's abuse and epithets.

On August 8, 1922, complainant and defendant mutually agreed to live separate and apart from each other from that time henceforth, and defendant thereupon went back to his Beaver Dam farm and complainant remained in her home at the grocery store in Centerville. Defendant and complainant have not lived and cohabited as man and wife since their mutual separation on August 8, 1922. No suit for a divorce was brought by either of the parties until complainant filed the present bill on February 23, 1923.

After a painstaking examination and consideration of the record, we concur in the finding of the chancellor that the charge of adultery contained in the bill is not proved by such satisfactory evidence as to warrant a decree for a divorce on that ground. The circumstances in evidence generate a strong suspicion that adulterous relations existed between defendant and Rose Berry, but this is not enough. Defendant vigorously denies that such relations existed at any time, and ''it is not sufficient that the circumstances tend to show guilt; they should be of such cogency as to exclude logically and naturally the hypothesis of innocence.'' Anderson v. Anderson, 3 Hig., 423, 427.

''Mere suspicion or circumstances of suspicion will not suffice. The circumstances must be such as would lead the guarded discretion of a reasonable and just man to no other conclusion. Where the circumstances singly or together admit of two interpretations, the interpretation in favor of innocence should be adopted.'' Keezer on Marriage and Divorce (2nd Ed.), sec. 242.

Aside from complainant's testimony that she saw certain incriminating evidence of improper relations between defendant and Rose Berry on May 16, 1922 (which testimony is not supported by the record), the charges of adultery depend on circumstances capable of two interpretations, one of which is consistent with the innocence of the defendant. In view of this state of the record, a divorce should not be granted on the ground of adultery. 19 Corpus Juris, pp. 137-139.

We do not concur in the finding of the learned chancellor that the failure of the defendant to interfere earlier in the ''difficulty'' between complainant and Rose Berry amounted to, and was, such cruel and inhuman treatment toward complainant as entitles her to a divorce from defendant. In the first place, we are not at all satisfied that the proof supports the conclusion that defendant failed to interfere as soon as he could reasonably do so under the circumstances in which he was placed at the time. But, however that may be, we are of the opinion that his failure to interfere at an earlier stage of the ''difficulty'' did not constitute cruel and inhuman treatment, within the contemplation of our divorce laws. He cannot be held to answer for the acts of Rose Berry in the ''difficulty,'' in the ab-

sence of evidence that he procured or approved same, or (which is practically the same thing) that he voluntarily refrained from interfering because of sympathy for Rose Berry. 19 Corpus Juris, p. 47; Holt v. Holt, 204 Mass., 25.

The allegations in the bill that defendant pulled complainant's hair, "struck her on the head, and pushed her back, and kicked her, and then threw her violently to the ground, and twisted and broke complainant's right ankle" are not sustained by the proof. We are satisfied that when defendant intervened to stop the fight, he used no more force than was necessary to hold complainant and prevent her from renewing the assault on Rose Berry.

We are of the opinion that complainant is not entitled to a divorce on the ground of abandonment, or of a "failure and refusal to provide." At all times after her marriage to defendant and before the separation, complainant was in possession of an abundance of means to provide for her necessities, and the property thus in her possession was largely made up of personalty which, under an antenuptial contract with defendant, was defendant's property. Through the separation agreement. of August 8, 1922 (hereinafter set forth in full) complainant released all further claims on defendant for support; and abandonment and desertion are not available as causes of divorce on behalf of a wife or husband living apart by mutual consent. Franklin v. Franklin (Mass.), 13 L. R. A., 843; Note, 83 Am. S. R., 873.

There is one fact averred in the bill, and shown by the record without dispute, which, in our opinion, amounted to, and was, such cruel and inhuman treatment of complainant by defendant as entitles complainant to a divorce from defendant, and that is, that shortly after the separation agreement of August 8, 1922, defendant brought Rose Berry back to his home on Beaver Dam Creek, and since her return she has (or had when this case was tried below), to all outward appearances, occupied the same status, and the same relations to defendant and his home, that she occupied prior to May 16, 1922.

Cruel and inhuman treatment within the meaning of our divorce laws, is not confined to acts of physical violence. Gardner v. Gardner, 104 Tenn., 410, 412, 58 S. W., 342; Fitzpatrick v. Fitzpatrick, 131 Tenn., 54, 63, 173 S. W., 444; Shell v. Shell, 2 Sneed, 716, 728.

In Gardner v. Gardner, supra, the Supreme Court quoted with approval from 5 A. & E. Ency. of Law (Old Ed.), p. 799, as follows: "Cruelty as a cause of divorce is the wilful, persistent causing of unnecessary suffering, whether in realization or apprehension, whether of body or mind, in such a way as to render cohabitation dangerous and unendurable."

We think it apparent that, after all that had theretofore occurred, as disclosed by the record, the defendant, by taking Rose Berry back

into his home, was guilty of an affront to his wife which necessarily caused her great and continued mental suffering, and which conduct on the part of defendant constituted cruel and inhuman treatment within the meaning of our divorce laws, and that the decree of the chancery court granting a divorce to complainant on that ground should be affirmed. The separation agreement, and the fact that complainant and defendant were living apart, is not a bar to a divorce on this ground. 9 R. C. L., p. 376; Note, 83 Am. St. R. 873; Keezer on Marriage and Divorce (2nd Ed.), sec. 217; 19 Corpus Juris, 250-251; Archbell v. Archbell, 158 N. C., 408, 1 Anno. Cas., 1913d, p. 261; Galusha v. Galusha (N. Y.), 6 L. R. A., 487, 15 Am. St. R., 453.

It remains to be determined whether the chancellor's decree awarding alimony to complainant in the sum of $4000 and solicitors' fees in the sum of $500 is or not erroneous.

It is contended for defendant that, by a valid written agreement, duly executed by the parties on August 8, 1922, complainant released and relinquished all further claims on defendant for support and maintenance and that said agreement is a bar to an allowance of alimony in this case. Defendant pleaded said agreement as a bar to a decree for alimony. In order to dispose of the questions thus raised, it becomes necessary to make an additional statement of facts appearing in the record.

A few hours before their intermarriage defendant and complainant entered into an ante-nuptial contract, which was duly executed and acknowledged by them, and which was registered in the Register's office of Hickman county, and which is as follows:

"We, Wm. A. Russell, hereinafter known as the party of the first part, and Mrs. L. M. Kelley, hereinafter known as the party of the second part, in consideration of our contemplated marriage, and upon condition that such marriage shall become consummated in the future, do hereby agree, obligate, and bind ourselves as follows, to-wit:

"The said party of the first part does hereby agree, obligate and bind himself, in case the party of the second part shall survive him, and for the purpose of a homestead and dower in her favor, and in lieu and stead thereof, that the said party of the second part shall, one day after the death of the party of the first part, take possession of the following described real estate and personal property, for and during her natural life, to-wit:

"Real Estate.

"Said party of the second part shall have all of that portion of my land in my bottom, known as the Widow Shipp Bottom, above Centerville, and in the 1st Civil District of Hickman county, Tennessee,

that lies down Duck River, north or northwest of a straight line across said bottom, said line beginning at a locust tree on the side of the bank of said river near the upper end of a new ground, runs thence southwardly by a red elm tree on the right hand side, of the road going up the bottom, and on southwardly with the nearest corn row pointing to said tree across said bottom to the railroad. She is also to have for and during her natural life along with the lands just described, and as above stated, in lieu and stead of a homestead and dower, the best dwelling house owned by me, said party of the first part, at his death.

"Personal Property.

"Automobile, wagon and team, harness for said team, two milk cows and twelve months supplies for family. Said party of the second part is to take possession of said property the first day after the death of said party of the first part, as above stated, and to have full use and control of the same for and during her natural life, but at her death all of said property, both real and personal, is to be equally divided between the bodily heirs of said party of the first part. Said provisions are in lieu and stead of any and all claims that the party of the second part may have in and to, or against the estate of said party of the first part.

"And the party of the second part, for and in consideration of our said contemplated marriage, and upon condition that said marriage shall become consummated in the future, and in consideration of the stipulations stated above on the part of the party of the first part, does hereby agree, obligate, and bind herself to accept the above provisions in full and complete satisfaction of any and every claim, either in law or equity, or otherwise that I may have in and to, or against, the estate of said property of the first part, as his widow."

"And said party of the second part, for the consideration above recited, does also hereby agree, obligate, and bind herself, to donate and turn over to said party of the first part, the day after our marriage, all of the personal property, choses in action, etc., including any monies, stocks, bonds, etc., owned by said party of the second part, to have and to do with as he pleases.

"Said party of the second part does hereby certify that she has read, or heard read this contract or agreement, and the contents and provisions embraced herein fully and thoroughly explained to her, and that she fully understands the intent and meaning and effect of said contract or agreement and the provisions thereof.

"Witness our hands, this the —— day of Sept. 10, 1921.

"W. A. Russell,

"Party of the first part.

"Mrs. L. M. Kelley,

"Party of the second part.

"Witness: "N. A. Tenham, Mrs. E. S. Thompson.

"This contract or agreement executed in duplicate."

On August 8, 1922, complainant and defendant entered into a written agreement to select arbitrators for certain purposes therein stated, which agreement is as follows:

"We, Mrs. W. A. Russell and W. A. Russell, bind ourselves respectively to each other in the sum of three thousand ($3000) dollars, to be paid on the condition hereinafter mentioned. The condition of this obligation is such, that whereas, we have agreed and do hereby bind ourselves, to submit to the arbitration and award of S. L. Whitson, W. L. Downey, and W. D. Lowe, all matters in dispute between us of any kind and description whatever, especially as to a settlement between us, or an accounting between us. It is also agreed that said arbitrators shall meet at the store-house of Mrs. Russell on the 8th day of August 1922, at 8 o'clock A. M., or any other place they may designate, we being notified, to consider of and determine the matters hereby referred to them. Now, if we shall stand to, abide by, and perform whatever the said arbitrators, or any others we may mutually select, may decide and award in the premises, then this obligation to be void; but it shall remain in full force and effect against either party failing therein.

"This the 8th day of Aug., 1922.

"Mrs. W. A. Russell
"W. A. Russell"

"We, Mrs. W. A. Russell and W. A. Russell, agree that the said arbitrators named above, may take the statement of Mrs. W. A. Russell at her store in East Centerville, out of the presence of W. A. Russell, and that then the statement of W. A. Russell may be taken at the office of W. L. Downey, in the Court House, in Centerville, out of the presence of Mrs. W. A. Russell, and that the above bond shall hold good in that event, and the presence of each when said statements are made are hereby waived.

"This Aug. 8, 1922.

"Mrs. W. A. Russell,
"W. A. Russell."

Two of the arbitrators were selected by complainant and one was selected by the defendant, and the three arbitrators made an award as follows:

"Whereas, W. A. Russell and Mrs. W. A. Russell have referred to us as arbitrators all matters in dispute between them of every kind and description whatever, especially an accounting between them, to determine the same; and we having met at the storehouse of Mrs. Russell and the office of W. L. Downey respectively, in Centerville, Tennessee, on this the 8th day of August, 1922, and heard the state-

ment of Mrs. Russell and W. A. Russell, respectively, each out of the presence of the other, and considered all the proof, etc., including the marriage contract made and entered into by and between the said W. A. Russell and Mrs. W. A. Russell, and fully considering and understanding the matters in controversy, do determine, decide and award that W. A. Russell shall refund and pay to Mrs. W. A. Russell in their final settlement, the following sums:

"$1060 proceeds of R. T. Easley's note, $140 amount expended for buggy, $110 amount expended for mare, $100 amount paid him for stamps, $18.68 check to Anderson Bros. & Foster, $15.50 check to Anderson Bros. & Foster, $78 amount expended for furniture, $180 cash to buy mules, $700 currency advanced to him, $468.56 check on Dickson Bank, all aggregating $2867.74.

"We further determine, decide, and award that Mrs. W. A. Russell shall turn over to W. A. Russell the following property, viz; the buggy mentioned above, the mare mentioned above, the stamps mentioned above, the furniture mentioned above and the mules mentioned above, and further, that the said Mrs. W. A. Russell relinquish and release to the said W. A. Russell all the right, title and claim, and interest she may have in and to the above described and mentioned property.

"We further determine, decide, and award that the Dodge touring car, in which both parties have money invested, be sold at public auction to the highest and best bidder for cash, after having advertised for ten days, and that both parties share in the proceeds of said car according to the amount of money each has invested therein, and we recommend that said car be turned over to H. M. Barr for sale, in accordance with the above award; provided, however, if either party wants the car and will pay $800 for same, he or she may have it for said sum.

"In so much as W. A. Russell was head of the family at the time Mrs. W. A. Russell's leg was broken, and as head of the family, under the law would be required to pay any doctor's bill incurred on her account, we determine, decide, and award that W. A. Russell shall pay the doctor's bill, up to this date, on account of Mrs. W. A. Russell's broken leg, but no further or more.

"We find that by the terms of the marriage contract made and entered into by and between W. A. Russell and Mrs. W. A. Russell, dated October 3, 1921, and recorded in the Register's office of Hickman County, Tennessee, in Deed Book, W-1, page 116, that Mrs. W. A. Russell was to turn over to the said W. A. Russell, at once, certain monies, bonds, stamps, etc., and has failed to do so, we determine, decide and award that the said W. A. Russell shall have interest on said sum or sums, or so much thereof as has not been turned over to him in accordance with said contract, which we cal-

culate to be $655, which amount is to be a credit on and deducted from the $2867.74 mentioned and set out above.

"We determine, decide, and award that the marriage contract heretofore mentioned as having been made and entered into by and between W. A. Russell and Mrs. W. A. Russell, dated October 3, 1921, and recorded in Deed Book W-1, page 116, of the Register's office of Hickman county, Tennessee, be, and the same is hereby annulled and made void and for nothing held, and that both W. A. Russell and Mrs. W. A. Russell be absolved from further liability on account of same.

"In view of the premises and circumstances, knowing the parties, and their manner of living, or getting along as man and wife, as we do, and being certain that they are ill-mated, unsuited and will never live happily together as man and wife, and knowing it to be to the interest of both parties concerned, we recommend a separation and the living apart by them.

"We further determine, decide, and award that the above award shall be in lieu of any and all claims that either party, W. A. Russell or Mrs. W. A. Russell, may have against the estate of the other, on account of their said marriage, marriage contract and separation, or in any way connected therewith, either now or hereafter, but the same is to be in full satisfaction of any and all claims either party may have against the other now, or hereafter.

"Witness our hands, this the 8th day of August, 1922.

                         "Sam W. Whitson, Arbitrator,

                         "W. D. Lowe, Arbitrator,

                         "W. L. Downey, Arbitrator."

Thereupon complainant and defendant entered into and executed a further written agreement and contract as follows:

"Whereas, we, W. A. Russell and Mrs. W. A. Russell, having submitted all matters in controversy between us to S. L. Whitson, W. L. Downey, and W. D. Lowe, as arbitrators, to arbitrate for us; and whereas, the said arbitrators accepted and met and considered all matters and made their award, which award is attached hereto, now, therefore, in consideration of the premises, and said award, we do hereby each to himself and herself, respectively, and our heirs and representatives, agree to and accept said award unconditionally and in full, and agree that a final settlement between us, in accordance with said award, shall be in full satisfaction of any and all claims that either of us may have against the other, now or hereafter, and that we do each hereby release and relinquish to the other any and all claims that either of us may have against the estate of the other, now or hereafter.

"Witness our hands, this the 8th day of August 1922.

                         "Mrs. W. A. Russell

                         "W. A. Russell."

It should be remembered that when the foregoing separation agreement was entered into complainant had in her possession personal property to the value of approximately $10,000 which, by virtue of the ante-nuptial contract, belonged to defendant, and which, by the terms of the separation agreement, defendant surrendered to complainant. Defendant also restored to complainant more than $2000 of personalty which complainant had turned over to him pursuant to the ante-nuptial contract. There was, therefore, a consideration for the contract, in addition to the legal obligation of a husband to support his wife, which ordinarily constitutes the basis for a separation agreement by which it is definitely determined how much the husband is obligated to contribute and the wife is entitled to receive from him for her support. 9 R. C. L., p. 528; Galusha v. Galusha, supra, p. 490; Buttlar v. Buttlar (N. J.), 73 Am. St. R., 648, 655.

It will also be observed that the provisions of the award made by the arbitrators were adopted by complainant and defendant as the terms and stipulations of a subsequent contract between them, and it is, therefore, unnecessary to consider the validity and effect of the award of the arbitrators, as such. The questions for decision on this branch of the case relate to the validity and effect of the agreement between complainant and defendant for a separation, and the settlement and adjustment of their respective property rights, and the the release of defendant from further obligation to support and maintain complainant, treating the award of the arbitrators as merged and incorporated in the contract between the parties.

Under the early English common law, separation agreements were illegal as against good morals and contrary to public policy; but in modern times such agreements, when they contemplate a separation in præsenti or the continuance of existing separation are generally upheld by the courts, both in England and America. 9 R. C. L., p. 524; Note, 83 Am. St. R., pp. 860, 862; Note, 12 L. R. A. N. S., pp. 848-853; Keezer on Marriage and Divorce (2nd Ed.), sec. 210; Blair v. Blair (Kan.), 186 Pac., 746; Archbell v. Archbell, 158 N. C., 408, Anno. Cas., 1913-D, 261.

It was formerly the custom, in making such agreements, for married women to be represented by trustees, but where the common law disabilities of married women have been removed by statute (as in Tennessee), a valid separation agreement may be made without the intervention of a trustee. 9 R. C. L., p. 527; Winter v. Winter (N. Y.), 16 L. R. A. (N. S.), 710; Keezer on Marriage and Divorce (2nd Ed.), sec. 213.

"The separation agreement does not in general prevent either party from securing a divorce. A subsequent divorce will not ordinarily terminate the agreement unless it is so provided therein, and upon such divorce being granted the court has no right to interfere with

the agreement against the will of the parties. It may, however, require the parties to annul the agreement as a condition to allow alimony. The court granting the divorce may use the separation agreement as a basis of fixing the alimony, but is not required to do so.'' Keezer on Marriage and Divorce (2nd Ed.), sec. 217.

See also Carey v. Mackey (Me.), 17 Am. St, R., 500; 9 R. C. L., p. 536.

No additional allowance can be granted to the wife on divorce, where a prior valid agreement for separation making a provision for her, which she has covenanted to accept in full for her support and maintenance during her life, is still in force. Galusha v. Galusha, supra; Archbell v. Archbell, supra; Blair v. Blair, supra.

We find from the record that the ante-nuptial contract and the separation agreement were entered into and executed by complainant voluntarily and understandingly, and that her execution of said contracts was not brought about by fraud, coercion or duress, as alleged in the bill.

We are of the opinion that the complainant had the right to contract with defendant for a settlement of their respective property rights, and including the future support and maintenance of complainant. The provision for the support of the wife in such agreements may be accomplished either by a division of property or a periodic allowance. The former plan was adopted in this instance. The parties had the legal capacity to contract, the subject of the agreement was lawful, the contract was voluntarily executed without fraud or duress, and we see no ground on which the court may disturb the settlement made by the parties.

It may be said, in passing, that the financial condition in which the defendant is left (under the decree of this court) is but little better than that of complainant, if the fact be taken ino account that complainant is without dependents and the defendant has two daughters dependent upon him for support. However, the possible hardship which may result to the parties, or one of them, from the application of settled rules of law is not a matter which should influence our judgment. ''The law is neither swayed by sympathy, nor warped by prejudice. The same general principles which govern similar cases must control this.'' Swan v. Harrison, 2 Cold., 540.

The disallowance of alimony will not affect an allowance of solicitors' fees. The separation agreement did not, and could not, preclude the suit for divorce, and complainant is therefore entitled to an allowance for her solicitor's fees. 25 A. & E. Ency. of Law (2nd Ed), p. 469.

That part of the decree of the chancellor whereby he granted to complainant alimony in the sum of $4000 is reversed, and no alimony will be allowed. The decree granting the divorce and dissolving the

bonds of matrimony subsisting between complainant and defendant, and restoring to complainant all the rights of an unmarried woman, including her former name of Sallie E. Kelley, will be affirmed, on the ground stated in this opinion. In other respects the decree of the chancery court will be affirmed.

The costs of the appeal will be adjudged against the defendant and the surety on his appeal bond.

Crownover and DeWitt, JJ., concur.