GEORGE C. EBLEN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Eblen v. Commissioner
Docket Nos. 6239-79, 6240-79, 6577-79.
United States Tax Court
T.C. Memo 1982-448; 1982 Tax Ct. Memo LEXIS 292; 44 T.C.M. (CCH) 706; T.C.M. (RIA) 82448; August 4, 1982. George C. Eblen, pro se in docket Nos. 6239-79 and 6240-79. William W. Berry, Jr., for the petitioner in docket No. 6577-79. Isham B. Bradley, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket No.
Year
Amount of Deficiency
6239-79
1973
$21,990.47
6240-79
1974
4,342.22
6577-79
1973
16,116.02
1974
1,760.76
Concessions having been made as set out in the parties' stipulations of agreed issues, the following issues remain for decision by the Court: 1. Whether the Eastover Farm was jointly owned by George C. Eblen and Bettye H. Eblen so that upon sale of that farm pursuant to their alimony and property settlement agreement each spouse must report one-half of the capital gain from that sale; 2. If George C. Eblen must report the entire gain from the sale of the Eastover Farm, whether he must report during 1973 the gain attributable to one of the promissory notes (No. 2) received from the purchasers which he endorsed and delivered to Bettye H. Eblen during 1973. This depends *294 on whether George C. Eblen retained an ownership interest in that installment obligation or made a "disposition" of the promissory note endorsed to Bettye H. Eblen within the meaning of section 453(d)(1); [2]
3. Whether George C. Eblen may deduct as alimony under section 215 the amounts received by Bettye H. Eblen attributable to promissory note No. 2 and whether such amounts are includable in her gross income under section 71(c); and 4. Whether George C. Eblen is entitled to deduct as alimony under section 215 the $2,000 paid to Bettye H. Eblen in 1973 in connection with the sale of certain furniture and other personal property to the individuals who purchased the Eastover Farm and the $5,000 paid in 1974 to the attorney who represented her in the divorce proceeding. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. At the time their petitions were filed, petitioner George C. Eblen (hereinafter *295 George) and petitioner June M. Eblen, husband and wife, lived in Shelbyville, Tennessee. June M. Eblen is a party solely by virtue of filing a joint return with her husband in 1974. George's return for 1973 and the spouses' joint return for 1974 were filed with the Internal Revenue Service Center, Memphis, Tennessee. At the time her petition was filed, petitioner Bettye H. Eblen (hereinafter Bettye) lived in Titusville, Florida. Her individual income tax return for 1973 was filed with the Internal Revenue Service Center, Memphis, Tennessee, and her return for 1974 was filed with the Atlanta Service Center, Atlanta, Georgia. George and Bettye were married in 1943 and two children were born of that marriage. George was an attorney and a farmer. Bettye was a homemaker. In 1952 George's father, Charles H. Eblen, executed his will, dated January 26, 1952, the pertinent provisions of which were as follows: ITEM THREE
I will, devise and bequeath to the Testamentary Trustee, hereinafter named, and his successors in trust, under the terms, conditions, trusts and stipulations hereinafter set out, the following real estate and personal property, to-wit: My farm located in *296 the 20th Civil District of Bedford County, Tennessee, together with all farming implements and tools, machinery, vehicles, equipment and every other item used in the operation of my farm, dairy and cattle business, also all stocks and bonds and accounts receivable of which I may die the owner, except my guns, boat, trailer, motor, camping outfit and fishing tackle which I give and bequeath to my son, George C. Eblen. ITEM FOUR
It is my will and desire that this trust shall continue during the lifetime or widow-hood of my wife, Nettie Jane Eblen in the event she survives longer than ten years after my death, but in the event my said wife, Nettie Jane Eblen, should die within ten years after my death, then it is my will that this trust continue for the period of said ten years and at the expiration of said time or the death of my wife should she survive longer than ten years after my death, I give and bequeath all of my property, real, personal and mixed, including all property contained in said trust to my said son, George C. Eblen if living, and to any child or children of my said son, George C. Eblen that may survive him, share and share alike, should he die before the expiration *297 of said years or precease [sic] my wife, Nettie Jane Eblen. In the event my said son, George C. Eblen, should die within ten years after my death or predecease my wife, without child or children surviving him and after the expiration of ten years from my death or the death of my wife if she survives said period of time, I give and bequeath, will and devise all the rest and residue of my property, real, personal and mixed including all property contained in said trust to be equally divided between all my nieces and nephews living at the time of my death or to the child or children of any deceased nephew or niece, share and share alike, said child or children taking their deceased parent's share. ITEM FIVE
In the event my said son, George C. Eblen should die prior to the expiration of ten years after my death or predecease my wife, then, and in that event his one-half of the net profits or benefits arising from said trust shall be paid to his widow to be spent by her for the support and maintenance of any child or children of my said son, George C. Eblen. In the event my wife should die prior to the expiration date of the trust, I give and bequeath the benefits given *298 her to my son, George C. Eblen, if living, and if deceased, to his child or children surviving him or their representatives, and in the event of no child or children surviving him or their representatives, to my nieces and nephews, share and share alike as hereinabove stated. The farm referred to in the will was known as the "Eastover Farm." George was named in the will as the testamentary trustee. In May of 1961, George's father died. His will was duly probated and was otherwise effective for the conveyance of property. The testamentary trust with George as trustee came into existence in 1961. The father's widow died in November of 1961 but under the terms of the will the trust was to continue for at least 10 years after the father's death. Thus the Eastover Farm was held in trust under the terms of the will of Charles H. Eblen until May of 1971, when the trust terminated. From about 1961 onward, George and Bettye lived on the Eastover Farm. By deeds of trust dated August 26, 1966, and July 6, 1967, signed by both George and Bettye, [3] the Eastover Farm was mortgaged in order to finance certain remodeling work on the farm house. *299 In February of 1972 Bettye filed a petition in the Chancery Court for Bedford County, Tennessee, for an absolute divorce on the grounds of cruel and inhuman treatment. The petition recited that the spouses resided "on a farm owned by the defendant [George] and located on Route #4, in Bedford County, Tennessee," that farm being the Eastover Farm. The petition was silent as to any homestead rights, but did seek an equitable distribution of real and personal property, alimony, and her costs and attorneys fees. Subsequently, George and Bettye executed an Alimony and Property Settlement Agreement, dated December 1, 1972. The spouses contemplated a fairly equal division of property under the terms of that agreement. The agreement provided for the conveyance to Bettye of one-half of certain antiques (or $30,000), certain shares of stock, and half of the proceeds of sale of an apartment house on Belmont Avenue in Shelbyville, Tennessee.The Belmont Avenue apartment house was owned in fee simple by Bettye and George. In regard to the Eastover Farm, the agreement provided as follows: 6. That the farm, inherited by husband and known as Eastover Farm, located at Route 4, Bedford *300 County, Tennessee, containing 540 acres more or less has been listed by the husband for sale with the United Farm Agency in Manchester, Tennessee, and the husband has been presented with a written purchase offer as set forth in a Contract of Sale dated the 16th day of November, 1972, and signed by Everett Palmer and wife Eileen B. Palmer as purchasers. The said Everett Palmer and wife Eileen B. Palmer have offered to purchase the entire farm for the sum of $220,000.00, payable as follows: $11,000.00 upon the execution of the Contract of Sale by all parties; $11,000.00 on or before the 16th day of December, 1972; and $33,000.00 on or before the 16th day of January, 1973. The balance of the purchase price is to be paid in 10 annual installments with each installment being in the amount of $16,500.00 plus interest on the unpaid balance of the purchase price at the rate of 6% per annum. The deferred payments are to be evidenced by a promissory note or notes secured by a deed of trust on the said real estate. Wife agrees that she will sign the said Contract of Sale and when called upon so to do by the husband will also join in the deed of trust conveying the said property to Everett Palmer *301 and wife Eileen B. Palmer. Husband agrees to have the buyers execute two notes for the unpaid balance of $165,000.00, each note to be in the amount of $82,500.00, payable in 10 equal annual installments of $8,250.00 each plus interest on the unpaid balance at the rate of 6% per annum. Each of said notes are to be secured by a deed of trust on the said real estate. Husband agrees at the closing of the sale that he will properly endorse, transfer and deliver one of the said notes to the wife as a part of this property settlement. If for any reason the property is not sold to the Palmers, the husband agrees that he shall continue, in good faith, to attempt to sell the property at its reasonable market value and will use his best efforts to perfect a sale in the immediate future. The wife will retain the right of occupancy of the residence situated on the farm until the sale thereof and for a period not in excess of 60 days thereafter. The husband agrees that when the property is sold, one-half (1/2) of the net proceeds thereof, after payment of commissions and expenses of sale, will be paid by husband to the wife. It is further agreed that the proceeds of the sale shall be deposited *302 in a special banking account requiring the signature of both parties for the purposes of withdrawal until such time as one-half (1/2) of the proceeds is paid to the wife according to this Agreement. The spouses had no agreement as to who would report and pay the Federal tax on the capital gains from the sale of the Eastover Farm. [4]
In addition the spouses' agreement made provision for alimony as follows: 9. Husband agrees that he will pay to wife as alimony for her support and maintenance the sum of Five Hundred ($500.00) Dollars per month beginning with the date of this instrument until such time as the value of the various sales and conveyances * * * made to the wife pursuant to this Agreement could provide to the wife an income *303 equal to such sum, computed at 6% per annum, or her remarriage, whichever should first occur. Husband guarantees that wife will receive as a result of the sale of the Eastover Farm, the Belmont Avenue property, the value of the antiques according to the appraisal of Virginia G. Walker in 1966, and the stocks referred to in paragraph 5 a minimum of One Hundred Thousand ($100,000.00) Dollars, after paying all taxes and expenses of sale or transfer. In the event that wife does not receive the minimum amount of One Hundred Thousand ($100,000.00) Dollars as a result of the sale and transfer of the property mentioned in this paragraph, then the husband agrees that he will pay the deficiency in cash, payable at the rate of Five Hundred ($500.00) Dollars per month, said payments to begin immediately after the transfer or sale of all property described in this paragraph. The Eastover Farm was sold, as contemplated by the Alimony and Property Settlement Agreement, to the Palmers. The sale was closed on January 16, 1973, and the Eastover Farm was conveyed to the Palmers by a warranty deed of that date signed by George and Bettye. The warranty deed, prepared by George himself, listed *304 only George as the grantor or seller of the property. The warranty deed recited that Bettye did "hereby join in this conveyance for the purpose of waiving any right, title, claim or interest, in law or in equity which [she] may have, or be entitled to" in the Eastover Farm. At the closing the Palmers executed two promissory notes (No. 1 and No. 2), each in the amount of $82,500, representing the balance of the purchase price for the farm. Each note recited a promise to pay $82,500 to George. These notes were secured by a deed of Trust mortgaging Eastover Farm. [5] When the sale was closed, the $55,000 cash which had been received partially as earnest money was disbursed as follows: Payment of balance of 1966 and 1967 mortgage
$25,894.50
Half of real estate agent's commissions
10,000.00
Payment to Bettye
2,000.00
Payment to Bettye
8,267.50
Payment to George
8,267.50
Miscellaneous closing costs
570.50
Total:
$55,000.00
The $2,000 payment *305 to Bettye represented an additional payment by the Palmers for certain furniture and other personalty sold along with the Eastover Farm. On January 16, 1973, George assigned and delivered promissory note No. 2 to Bettye with the notation "with recourse." By a decree dated December 12, 1973, Bettye was granted an absolute divorce on the grounds of cruel and inhuman treatment. The decree approved and incorporated as a part of the final decree the spouses' written agreement of December 1, 1972. The decree also directed George to pay Bettye's attorney a fee of $5,000. During 1973 George made periodic payments of $500 per month pursuant to Paragraph 9 of the Alimony and Property Settlement Agreement, totalling $3,000. Those periodic payments terminated on or about June 6, 1973, when the total sales proceeds and conveyances to Bettye totalled $104,767.50, thus satisfying the $100,000 minimum amount provided in Paragraph 9. That $100,000 plus figure included the cash received at the closing, the $82,500 principal amount of promissory note No. 2, and half of the net proceeds from the sale of the Belmont Avenue apartment. In 1974 George paid $5,000 to the attorney who represented *306 Bettye in the divorce proceeding as required by the spouses' agreement and by the divorce decree. In January 1974, the Palmers paid to George $26,400 representing the first installment of principal and accrued interest on the two promissory notes executed by them at the closing. From this sum George paid the remaining $10,000 real estate agent's commission and deposited one-half of the remaining balance of $8,200 in Bettye's bank account. Beginning with the payment due in January 1975, the Palmers thereafter paid all amounts due on promissory note No. 2 directly to Bettye. On his separate 1973 individual income tax return, George deducted an amount of $5,000 as alimony paid to Bettye. That amount was composed of the $3,000 in periodic payments and the $2,000 for furniture and personalty sold to the Palmers. On his 1974 return George deducted the amount of $5,000 paid to Bettye's attorney as additional alimony. On audit respondent disallowed the alimony deductions to George for both years. Bettye had reported alimony income of $3,000 for 1973, and respondent now agrees that George is entitled to a deduction for that amount. Respondent also increased Bettye's 1973 alimony *307 income by an amount of $8,267.50, thus treating her one-half of the down payment on the Eastover Farm as additional alimony income. For 1974 Bettye reported no alimony income and on audit respondent increased her income by $13,150, which included $4,950 of interest on promissory note No. 2 that Bettye had already reported as interest plus the $5,200 payment received as a payment on the principal of that note. On his 1973 return, George reported only one-half of the capital gains received on the sales of the Eastover Farm and the Belmont Avenue apartment. Bettye reported none of this capital gain on her return but now agrees that she must include in her 1973 income one-half of the gain from the sale of the Belmont Avenue apartment. OPINION The first issue to be decided is whether Bettye had an ownership interest in the Eastover Farm. George contends that she did not that she is thus liable for the Federal tax on one-half of the gain from the sale of that farm. We disagree and hold that George must report the entire gain. The Eastover Farm originally belonged to George's father and George inherited it under the terms of his father's will. Tennessee is not a community property *308 state and Tennessee recognizes separate ownership of property by spouses. Matthews v. Matthews,24 Tenn. App. 580, 148 S.W. 2d 3, 13 (1940). [6]
George and Bettye lived on the farm for many years as their marital residence. Thus, Bettye's interest in the farm, if any, was her rights of dower and homestead. Dower and homestead are purely inchoate rights. Dower rights are contingent and do not arise unless and until the husband dies. Swift v. Reasonover,168 Tenn. 305, 77 S.W. 2d 809, 810 (1935). As will be discussed more fully below, the homestead right must be claimed in the divorce proceeding or it is lost. George relies upon Tennessee Code Annotated § 36-824, as it read in 1973, [7] providing that: *309 36-824. Transfer of title to homestead when wife obtains divorce.--If the head of a family is married, and his wife obtain a divorce on account of his fault or misconduct, the title to the homestead shall be vested, by the decree of the court granting the divorce, in the wife, and, after her death, it shall pass to their children. However, under Tennessee law, the wife must demand that homestead be decreed to her in the divorce proceedings or her rights to homestead are forever lost. Trimble v. Trimble,224 Tenn. 571, 458 S.W. 2d 794, 796 (1970); Moore v. Ward,107 Tenn. 731, 64 S.W. 1087 (1901); "Homestead in Tennessee," 25 Tenn. L. Rev. 261, 265 and cases cited in n. 40 (1958). Here Bettye did not request any homestead rights in her divorce petition and the divorce decree did not provide for any. Moreover, Bettye voluntarily waived any dower or homestead rights she may have possessed in the Eastover Farm by signing the warranty deed by which George sold the Eastover Farm to the Palmers.The warranty deed expressly recited that she signed it for that purpose. That occurred on January 16, 1973, several months before the divorce. *310 George attempts to treat this case as if one-half of the farm were conveyed to Bettye by the divorce court and she in turn sold her half interest to the Palmers. That did not occur. Moreover, even if Bettye had sought homestead rights in the divorce proceeding, that would not mean that the homestead would necessarily be set aside out of the Eastover Farm. Homestead is a limited right of occupancy that can even be satisfied by payment of the $1,000 homestead exemption amount that was still in effect in 1973, and Tenn. Code Ann. § 36-824 does not necessarily give the divorced wife a right to occupy the former family home.See Walters v. Walters,192 Tenn. 392, 241 S.W. 2d 503 (1951). Moreover, in the present case, the spouses' agreement expressly provided for a residence for each spouse, the Carter Street house for Bettye and the Route 4 house for George. See Paragraph 8 of the Alimony and Property Settlement Agreement. George's contention that Bettye's dower and homestead rights somehow made her an equal owner of the Eastover Farm is not well taken. He suggests that if we rule otherwise it would "make a mockery of the protection afforded wives * * * through *311 their homestead and dower rights." Dower and homestead rights are designed to protect the wife, not to make her liable for the taxes on her husband's separate property. We conclude that George is liable for the tax on the entire gain on the sale of the farm. Although respondent originally contended that George was not entitled to report the gain on the installment basis, respondent now agrees that installment reporting is not foreclosed by the receipt of the promissory notes. Section 453(b)(2)(A)(ii), as it read in 1973, [8] provided that the payments received in the year of sale must not exceed 30 percent of the selling price, but with a parenthetical provision that "payments" for purposes of that 30 percent limitation were "exclusive of evidences of indebtedness of the purchaser." However, while respondent admits that installment reporting is available to George, respondent says that he must nonetheless report in 1973 the gain attributable to promissory note No. 2 because he made a "disposition" of that note under section 453(d)(1) [9] by endorsing and delivering it to Bettye. George argues that he did not make such a disposition because the note was endorsed to Bettye "with recourse. *312 " The spouses' arguments as to whether the note was endorsed "with recourse" or "without recourse" are irrelevant and immaterial. It is true that the note itself physically bears the notation on the reverse side "with recourse." However, assignment of an installment obligation with recourse still constitutes a disposition. East Coast Equipment Co. v. Commissioner,21 T.C. 112 (1953), *313 affd. 222 F. 2d 676 (3d Cir. 1955). Paragraph 6 of the Alimony and Property Settlement Agreement provided, among other things, that Husband agrees at the closing of the sale that he will properly endorse, transfer and deliver one of the said notes to the wife as a part of this property settlement. When George endorsed and delivered that note to Bettye, that constituted a "disposition" of an installment obligation in that year in discharge of his marital obligations to her. Sec. 453(d)(1); Swaim v. Commissioner,417 F. 2d 353 (6th Cir. 1969), affg. 50 T.C. 302 (1968); Cf.United States v. Davis,370 U.S. 65 (1962). Merely because George endorsed the note "with recourse," presumably meaning that he guaranteed payment of the $82,500 to Bettye if the Palmers failed to pay it, does not mean that George retained any ownership interest in promissory note No. 2. We do not speculate as to the legal effect, if any, of his "with recourse" endorsement, particularly since both promissory notes were secured by a mortgage on the farm. Bettye received the $82,500 note as part of the property settlement before their divorce. *314 United States v. Davis,supra.We conclude that George did not retain any ownership interest in promissory note No. 2. Thus, there is no factual predicate for George's alternative argument that the payments to Bettye attributable to that promissory note constitute additional alimony payments deductible by him under section 215 and includable in Bettye's income under section 71(c)(2).
Therefore, George must report in 1973 any gain attributable to his disposition of promissory note No. 2, and he is not entitled to any alimony deductions for payments under that note either in 1973 or in subsequent years. Bettye of course must report in income any interest payments attributable to that note but she has already done so. Respondent improperly increased her income by that amount and improperly allowed the $4,950 interest on the note as additional alimony paid by George in 1974. Respondent also improperly treated the $8,267.50 payment in 1973 and the $8,200 payment in 1974 as additional alimony income to Bettye. The final issues in this case involve the $5,000 alimony deductions taken by George in each of the years 1973 and 1974. As to the $3,000 in periodic payments *315 in 1973 pursuant to Paragraph 9 of the Alimony and Property Settlement Agreement, which Bettye reported as alimony income on her separate return for that year, that amount was properly deducted by George, as respondent now agrees. As to the additional $2,000, that was not a payment of alimony by George but represented the proceeds of the sale of some of Bettye's furniture and other household items to the Palmers. George was acting as a mere conduit to transmit a payment from the Palmers to Bettye. He is not entitled to an alimony deduction for the $2,000. In regard to the $5,000 claimed as alimony in 1974, that represented George's payment of Bettye's legal fees in connection with the divorce proceeding. That payment to her attorney was required under the terms of the spouses' Alimony and Property Settlement Agreement and also under the terms of the divorce decree itself. Such a payment is neither "periodic" nor a support obligation "because of the marital or family relationship," as required by section 71(a), and thus does not constitute deductible alimony. Glasgow v. Commissioner,21 T.C. 211, 218 (1953); Baer v. Commissioner,16 T.C. 14188 1422-1423 (1951), *316 affd. on this point 196 F. 2d 646, 649 (8th Cir. 1952). [10]
To reflect the concessions and above holdings, Decisions will be entered under Rule 155.
Footnotes
1. Docket No. 6239-79 was consolidated for trial, briefing, and opinion with the cases of George C. Eblen and June M. Eblen, Docket No. 6240-79, and Bettye H. Eblen, Docket No. 6577-79.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, unless otherwise noted.↩
3. George's signatures on those deeds did not reflect that he was signing in his capacity as trustee. The deeds also recited that the realty had been "conveyed to the Grantors by Will dated January 26, 1952." However, that was an incorrect statement. Charles' will was conspicuously silent as to Bettye and the only provision in any way relating to her was Item Five providing that if George died prior to the expiration of 10 years after Charles' death or predeceased Charles' wife, then George's one-half of the trust "shall be paid to his widow to be spent by her for the support and maintenance of any child or children of my said son, George C. Eblen."↩
4. There is an apparent conflict in the testimony on this point. George testified that it was his intention that both parties to the agreement would "share the cost of any tax liability based upon what they received." However, he did not suggest that he had communicated his intention to Bettye nor that she shared that intention. Bettye testified that there was no discussion about how the various transactions would be handled for tax purposes.↩
5. The deed of trust was prepared by George C. Eblen and recited that the Palmers were indebted to George C. Eblen and wife, Bettye H. Eblen, in the principal sum of $165,000 evidenced by their promissory notes.↩
6. See also Dunn v. Commissioner,T.C. Memo. 1977-156↩.
7. This and other provisions of the Tennessee Code that applied to wives only were held by the Tennessee Supreme Court to violate the equal protection guarantees of both state and Federal law. Mitchell v. Mitchell,594 S.W. 2d 699↩ (Tenn. 1980). These provisions were amended in 1979 to remove the gender-based classification and make them gender-neutral and hence applicable to both husbands and wives.
8. SEC. 453. INSTALLMENT METHOD. (b) Sales of Realty and Casual Sales of Personalty.-- (2) Limitation.--Paragraph (1) shall apply.-- (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition-- (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price. ↩
9. (d) Gain or Loss on Disposition of Installment Obligations.-- (1) General Rule.↩--If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and--
10. See also Barrer v. Commissioner,T.C. Memo. 1981-256; Henson v. Commissioner,T.C. Memo. 1979-110; Rose v. Commissioner,T.C. Memo. 1971-147, affd. per curiam 459 F. 2d 28 (6th Cir. 1972); cert. denied 409 U.S. 879 (1972); Johnson v. Commissioner,T.C. Memo. 1971-132↩.