MATTHEWS v. MATTHEWS.—148 S. W. (2d) 3.

Middle Section. August 17, 1940.

Petition for Certiorari denied by Supreme Court, February 1, 1941.

J. N. Daniel and Cornelius, McKinney & Gilbert, all of Nashville, for appellant Charles G. Matthews.

Cochran & White, of Nashville, for appellee Willie Mai Matthews.

JOE C. HIGGINS, S. J. Appellee, complainant below, filed this her bill for divorce in the Chancery Court of Davidson County on the 18th of July, 1939. In her bill she alleged among other things that the appellant named as defendant below was guilty of cruel and inhuman treatment toward her and had offered many indignities to her person and had rendered her condition intolerable and made it unsafe and improper for her longer to cohabit with him and be under his dominion and control.

The original bill is quite lengthy. It would serve no useful purpose to recite and recall herein the somewhat nauseating charges of wrongful conduct embraced in the pleadings. It will suffice to state that those allegations replete with incidents and occurrences were such, if true, as to justify a divorce from bed and board in accordance with the prayer of her bill.

The ill treatment and inhuman and intolerable conduct consisted of discourtesies, humiliations, criminations, acts of violence and other occurrences rendering her condition unbearable.

Appellee alleged in her bill that two certain separate agreements which had been entered into between appellant and herself were fraudulent and void, for the reason that they were unfair and procured by fraud and by coercion and undue pressure; and she prayed that those agreements be set aside and that she be decreed support and alimony, and that the fees of her solicitors be paid by appellant.

She alleged that appellant was a man of great wealth and enjoyed an income of several hundred dollars per month, and that the provisions of the settlement agreements were as to her inadequate.

She sought an attachment and an injunction against the estate of appellant and prayed for a discovery respecting his assets.

Defendant answered denying in the main the allegations of cruel and inhuman treatment.

Appellant in his answer set out many extenuating circumstances attendant upon many incidents mentioned by complainant in her bill. He likewise averred many acts of provocation and of mitigation for his conduct. He denied the allegation that he was a rich man, but admitted that he had considerable business and some investments of a speculative nature, and that he did enjoy an income of several hundred dollars per month.

Complainant below amended her bill in several particulars, and appellant also amended his answer and converted it into a cross-bill, in which he claimed that appellee had been guilty of cruel and inhuman treatment such as justified the awarding of an absolute divorce to him.

The cause was heard by the Honorable W. A. Guild, a learned member of the Bar of Nashville, sitting as Special Chancellor. The hearing was an oral one.

Appellant disclosed in his amended answer that he had procured a divorce from appellee in the courts of the State of Nevada and he prayed that this decree be upheld as a valid and binding severance of the matrimonial ties between the parties.

His alternative prayer was that if for any reason the Nevada decree should be held void, he nevertheless be decreed an absolute divorce because of appellee's cruel and inhuman treatment of him.

The decree of the Chancellor was in substance that complainant below, appellee had sustained her charges of cruel and inhuman treatment or conduct such as rendered cohabitation of cruel and inhuman treatment made by appellant were not sustained by the preponderance of the evidence; that the Nevada decree of divorce was invalid and would not be recognized in this jurisdiction; that the so-called separation agreements between appellant and appellee, bearing dates of April 14, 1939, and July 6, 1937, were fraudulent and void for the reason that appellee had been induced to sign the same upon the representation on the part of appellant that the parties would resume their marital relations within a period of two or three months thereafter, and that he would not seek or apply for a divorce from her —the Court finding that said representations were false and fraudulent and were made by appellant with no intention to keep them; that at the time of the agreement of April 14, 1939, appellant was worth at least $100,000 and had an annual income of $20,000, and that the provision made in the aforesaid agreement was grossly inadequate.

The court further found that at the time of the execution of the April 14, 1939, agreement complainant had an intense love and affection for defendant, which influenced her in making the settlement, and especially in her conversation with appellant wherein he induced her to believe that he would not file a bill for divorce, and that he would resume relations with complainant, all of which representations and inducements the subsequent conduct of appellee showed he intended to violate.

The decreeing portion of the decree was that the original bill of appellee was sustained and that she be granted and was decreed a divorce from bed and board, and that separate maintenance be allowed to her, which was fixed by the court as $400 per month, beginning in the month of February, 1940, and payable on the 5th day of each month thereafter.

The court further adjudged that the separation agreements of April 14, 1939, and July 6, 1937, as well as an accompanying trust agreement, were all void and of no effect, and that they did or would in no way embarrass appellee with respect to her right to maintenance and alimony; and the court gave certain directions respecting the return to appellant of certain parcels of real estate which had pursuant to the agreement of April 14, 1939, been conveyed by appellant to appellee.

The court further declared that appellee was under no obligation to refund or restore any of the money or personal property or rents paid to her or received by her under the settlement of April 14, 1939.

The writs of attachment were dissolved but the temporary injunction was continued in force pending the disposition of any appeal which might be taken.

Appellant was ordered to pay the costs of the cause, including a fee of $750 to Messrs. Weldon White and Carmack Cochran, complainant's solicitors.

Defendant below excepted to all the provisions of the decree, especially the action of the court in finding and decreeing that defendant was guilty of cruel and inhuman treatment, and to the action of the court in finding that defendant had failed to sustain his cross-bill, and also to the decree of the court declaring the separation agreement of July 14, 1939, to be invalid, and decreeing of $400 per month to complainant as alimony and taxing appellant with the costs of the cause.

Appellant is here with six specifications of error. These will be treated by us in the order which seems most conducive to brevity and clearness.

By his fourth assignment of error appellant assails the decree of the learned Special Chancellor sustaining complainant's original bill and its charges of cruel and inhuman treatment such as justified a divorce from bed and board, and in decreeing that species of divorce to her.

In the fifth specification appellant complains that the court erroneously dismissed his cross-bill in that the Chancellor should have found and held that appellee was herself guilty of cruel and inhuman treatment such as justified the rendering of a decree for divorce in appellant's favor. Appellant also complains in the fifth assignment of the allowance of $400 per month separate maintenance, and in taxing appellant with fees of appellee's solicitors.

Appellant in the sixth assignment charges that the Chancellor erred in not decreeing to him a divorce.

As before stated, this cause was heard orally by the learned Special Chancellor. Decrees rendered pursuant to such hearings are entitled upon appeal to great credit, that is, the findings of the Chancellor after such hearing, are entitled to great weight and are not to

be lightly overturned. This favorable presumption indulged with respect to the findings pronounced by the Chancellor upon an oral hearing will not be extended or applied as to findings and decisions upon disputed issues of fact that are contrary to the preponderance of the evidence.

After carefully considering the case as a whole and bringing into view the above formulas for testing a decree in a divorce case, we have concluded that the decree of the Chancellor granting complainant a divorce from bed and board should be and it is sustained.

■ We note that the learned Chancellor did not make any specific findings of fact. This has rendered it quite difficult to ascertain the basic facts upon which the decree was pronounced. Nevertheless there is much material evidence which if believed by the learned Special Chancellor who saw and heard the witnesses, the appellant failing to show clearly that the findings were against the preponderance of the evidence, we shall accept the conclusions of the Chancellor with respect to the granting of the divorce from bed and board. We are inclined to agree and do agree with the Chancellor, as we assume he did, that the cause did not demand or that it was not proper that an absolute divorce be granted. It is manifest that this was what appellant desired, but courts should bear in mind that all pervading maxim that no one shall profit or obtain an advantage, or achieve a desired purpose by any wrongful conduct.

But we feel constrained in justice to appellant to find that there existed much provocation for a mitigation of many seemingly wrongful acts, and to find that his conduct was not of such enormity as to bring down upon him severe condemnation.

It is urged by learned counsel for appellant that in March, 1939, appellee had filed a bill for divorce against appellant, charging virtually the same species of cruel and inhuman treatment and indignities specified in the present bill; that shortly after April 14, 1939, and after the signing of the separation agreement bearing that date, and as preliminary or a part of said agreement, appellee had dismissed her bill of March, 1939, and had by this conduct and by acceptance of or participation in the agreement of April 14, 1939, forgiven appellant for all previous cruel and inhuman acts, and had condoned his conduct, and that her right to a divorce must be predicated upon his conduct subsequent to the date of dismissal of the March, 1939, bill. We do not deem it necessary to express any opinion upon that question at this time for the reason that all the terms and conditions of the April 14, 1939, agreement with the circumstances of its execution will be elaborately treated by us later on.

We shall enumerate a few of those provocative and palliative doings laid at his door of his spouse:

(a) That appellee is clearly shown to be a woman of high temper and of a jealous nature; that she became jealous of her husband

during their early and middle years of matrimony is clearly shown. And this jealousy was so deep-seated as to prompt appellee to threaten to do violence to the supposed objects of the husband's attentions. When the green-eyed monster jealousy with its twin sister suspicion, and with a blending of distrust take possession of the husband or the wife, there is very little hope for the dove of peace to alight upon their abode. The other party becomes suspect and is generally put upon the rack if there is the least departure from the path of rectitude. And when this feeling blended very very often with the deepest love becomes the dominant emotion, there is very little chance or expectation of matrimonial harmony. And when jealousy is so deep-seated as to cause a jealous wife to extend her authority and control to the office of the husband, and when she undertakes to select his office employees and becomes in a manner his employment agent, the average business man may be expected to resent and resist this foreign domination. We find in the record much evidence tending to support the contention of appellant that his wife was jealous of the female office help and on many occasions interfered therewith and caused the dismissal of such employees.

(b) Another species of conduct admitted by complainant below and shown by appellant to have become habitual, was the searching of his pockets at night and the abstraction therefrom of sums of money in varying amounts. The evidence points to the conclusion that this was a habit long followed by appellee; and we discount her excuse that this was necessary in order to provide her with necessities or comforts which appellant failed to provide for her. A wife cannot be condemned for abstracting money from the pocket of her husband while he sleeps if he wholly fails to provide her with a livelihood and support. On the other hand, no woman should expect to escape condemnation for such conduct when she was at liberty, as was the case here for a long time, to go to merchants and buy anything she wanted or needed, and while she did receive regularly an allowance sufficient approximately for her needs. Husbands may rightfully urge that such conduct upon the part of a wife is contrary to the spirit of that section of our State and Federal statutes prohibiting unlawful searches and seizures.

██ We enumerate the above circumstances for the purpose of and by way of a prelude to our consideration of the assignments of error wherein the decree of the court adjudging the separation agreements to be void is assailed. We are of the opinion that such settlements must be viewed in the light of the history and circumstances of the parties, and that no indulgence should be granted or allowed a husband wholly at fault with respect to his marital obligations. A husband who has wholly failed of his duty and has abandoned and neglected his wife, and has been guilty of outrageous conduct, should be held to a stricter rule of interpretation than is or

would be a husband who has arrived at the conclusion for substantial reasons that his matrimonial venture is a complete failure and that a permanent separation is the only means of enjoying peace or prosperity. We make this observation notwithstanding the fact that with respect to the validity of separation agreements, the conduct of the husband is not the sole consideration. This for the reason that in many of the cases examined by us wherein separation agreements were upheld husbands were guilty of the most reprehensible conduct.

We pass now to the consideration of the specifications wherein the decree of the Chancellor adjudging the separation agreements of July 6, 1937, and of April 14, 1939, is attacked.

The agreement of July 6, 1937, was executed while the parties were separated and at a time when each hoped that a reconciliation could take place, and that this would be achieved by the entering into of an instrument of writing wherein the wife would be allowed $100 per month during the joint lives of appellant and the wife in case of separation. The parties did subsequently go back together and cohabited with more or less satisfaction and contentment for some time after the execution of this agreement. Sometime in February, 1939, appellant wrote complainant that he had reached the conclusion that they could not live together and that he was leaving or intended to separate from her as contemplated in their previous arrangement. There were also some directions in this letter as to what should be done with the furniture, and as to the party or place to whom the $100 a month allowance should be paid. Shortly after the receipt of this letter complainant filed the bill of March, 1939. Sometime after this bill was filed appellant and appellee met in the office of Mr. John L. Gilliam, a highly respected citizen of Davidson County and who was related to appellant. Whether this meeting was by accident or by expectation is not now material. At all events the question of the adjustment of the differences between appellant and appellee arose and became the subject of conversation and deliberation between appellee and Mr. Gilliam after appellant left Mr. Gilliam's office. We infer that as a consequence of this meeting and at the suggestion of appellee, Mr. Gilliam approached the subject of an agreement and that it was discussed with the view of having appellant make suitable provision for his wife. At or about this time appellant admits that he consulted his attorney and that the latter drew up the agreement bearing the date of April 14, 1939, and that it was delivered to his wife for her consideration and perusal and for a response from her. It suffices to state without going into all details that a meeting between appellant and his wife and the attorneys of the parties, and particularly the attorneys of the appellee, the Honorable Sam Tatum, now Juvenile Court Judge of the City, and the Honorable Carmack Cochran, former Assistant District Attorney of Davidson County and now an able and trustworthy member of the Bar of Nashville, at which

this agreement was read over and examined and expounded section by section, and was assented to by appellee and signed and acknowledged by her. The evidence respecting this meeting as given by appellant seems not to be controverted, which was to the effect that the agreement was read over section by section and fully explained to appellee by one of her attorneys and General Cochran, with full explanation of all the consequences to her signing and accepting the same, and that the attorney took particular pains to bring out all the points or questions that might arise, and that appellee assented to the same and signed and acknowledged same.

Appellant denies that he sat with his arm around appellee at this conference and denies that he touched her or patted her, or did anything to overcome her independence of action. He also denies that he held out to her any promise of a reunion and denies that he made any promise to her that he would refrain from filing any bill for divorce.

After carefully reading all the evidence, we have reached the conclusion that this version of the matter, that is with respect to whether appellant promised his wife that he would reunite with her and would refrain from filing a bill for divorce is sustained, and that appellant did not give appellee such assurances, nor did he make her such promises. Our primary reason for reaching this conclusion is that the agreement on its face purports to embrace every promise or obligation of both the parties, and that the silence of the agreement with respect to reunion or the refraining from filing a bill for divorce, is a very strong circumstance supporting appellant in his denial that he gave such assurances. This for the added reason that the contract itself recites that they are separated and each declared the intention of living for the remainder of their lives separate and apart from the other.

It may be well to outline briefly the several provisions of the contract of April 14, 1939. We shall not undertake to pass upon the validity of the contract of July 6, 1937, for the reason that it was superseded by the latter agreement.

First, it is recited preliminarily that the parties had been living apart since February, 1939, and that they intended to continue living apart for the remainder of their natural lives. The filing of the bill for divorce of March, 1939, was recited, together with a brief summary of its contents, especially that portion attacking the agreement of July 6, 1937.

It was further recited that since the filing of the bill of March, 1939, the parties had reached an agreement as respects the division of their property, and for the future support of the wife.

The contract further provided that the wife would at once dismiss her bill of March, 1939, without prejudice; that so long as the wife lived and remained unmarried the husband agreed to pay her $125 per

month for the remainder of the life of the husband, and that at the death of her husband leaving the wife surviving and unmarried, she would be paid by a trust arrangement $100 per month for the remainder of her life; that the husband had or would deliver to the wife a deed conveying four parcels of real estate so as to vest the wife with the absolute ownership of those lots and all the property which the husband owns that was located on the east side of North Eighth Street; that the parties would divide the household furnishings in the Belle Meade home, which home the wife was to vacate within thirty days; that the lots conveyed to the wife were to be her separate property and estate; that all the property held by the husband at that time or which would become his thereafter shall remain his property, free from any claims of the wife; that the agreement was intended to be a final settlement of the property rights of the respective parties and a full discharge of the husband from all other obligations to support and a discharge from all other claims arising out of their marital relations, and that each relinquished to the other all rights or claims which each may have in the other's property by way of dower, curtesy, inheritance, descent or distribution or alimony and support, and that it applied to all property then owned by the husband or the wife, or any property that they may own thereafter.

It was further provided that the husband would pay the expenses of the suit then pending and about to be dismissed, including the wife's solicitors' fee.

It was further recited that the agreement avers that it had been entered into without any undue influence or fraud or coercion or misrepresentation or from any cause not therein specified.

A provision was made for the enforcement of the payment of the monthly allowance by the institution of suits if necessary, including a reasonable attorney's fee if brought to enforce the payments.

This agreement was signed and acknowledged by the two parties, including the privy examination of the wife in the manner prescribed by statute.

We recur to the testimony to the effect that all these provisions were read over and expounded by learned and able counsel representing appellee, and that appellee was made to understand and was given to understand the full purport and effect of the several provisions.

Significant is the privy examination of the appellee to the effect that she had signed the instrument voluntarily and understandingly and without compulsion or constraint upon the part of her husband.

We are sure that the reading and the explanation of this instrument including the meaning and effect and the purport of the privy acknowledgment were all made known to the appellee on that occasion. If, as a matter of fact, there was coersion upon the part of the husband, or if there had been made secret promises and there

had been held out hopes and expectation not therein recited, appellee was guilty of deceit in allowing her faithful attorneys to sit in upon this conference and advise with her and fully inform her of the effect of its terms and of its consequences to her. We will be more charitable to the appellee by indulging the presumption, or rather we will find as a fact that she thoroughly understood what she was doing and that the instrument expressed that which she intended. As we have before stated, the evidence does not support her contention that her husband had promised her to resume marital relations and to refrain from filing a bill for divorce. Supporting the husband, as we have stated, are the explicit terms of the contract, an agreement purporting on its face to embody every term and condition which had been discussed during preliminary negotiations and reduced to writing as a perpetual memorial of the agreement at which they did arrive. Further corroboration of the husband in his denial of any unexpressed or collateral agreement, is found in the testimony of that highly respected citizen, John L. Gilliam, to the effect that appellant had stated to his wife in the presence of the witness that he never intended to live with the wife again. The most favorable construction that can be placed upon this insistence of the wife is that she entertained hopes that her husband would refrain from a divorce and that he would subsequently resume marital relations with her. This expectation is not of so substantial a nature as to warrant a decree declaring such contract void. The courts do not sanction such implications and unexpressed agreements, and will refuse to give them effect in the absence of the most positive testimony that such collateral stipulation or agreements were entered into. Whittle v. Schlemm, 94 N. J. L., 112, 109 A., 305, 8 A. L. R., 1447, 17 Am. Juris., page 549.

Another circumstance having some corroborative value is that the husband in some way let it be known that he was contemplating a trip to Nevada for the purpose of filing a bill for divorce. Mrs. Gilliam, a kinswoman, heard of this and asked permission to talk with Mrs. Matthews about the advisability of her filing a bill here. When approached she suggested that her husband deposit with Mr. John L. Gilliam $1,000—this sum being the estimated cost of the contemplated western divorce. This proposition was entertained by Mrs. Matthews for several days and then rejected, but not upon the ground that it was violative of her husband's alleged representation to refrain from asking a divorce.

The greatest cogency is the fact that on May 23, 1939, some six weeks after the agreement of April 14th of that year, the parties entered into a supplemental agreement wherein the former contract was specifically referred to and recited with much detail, and to which contract the then to be executed instrument was supplemental, was entered into and signed by all parties, including Mr. Hofstetter representing appellant and Judge Sam Tatum appearing for appellee.

Appellee is in no position to deny and she does not dispute that she freely and voluntarily and understandingly executed this later paper. She then knew, as she had previously known on April 14th every fact or circumstance pertaining to the relations between her husband and herself, and she well knew on both dates the probable value and kind of property or assets held by him. And she must be conclusively held to have ratified her original agreement and acknowledged her obligation to observe its terms and conditions.

 It is needless to restate it, but we do, both for evidentiary purposes and likewise for its legal effect, that at the conference in which the April 14th agreement was expounded and its terms assented to and acknowledged, appellee was represented by two highly respected counsel of Nashville, vigilant of eye and each with a proboscis keenly attuned to the detection of the malodorous or the oppressive, gave their approval to the arrangement and recommended its acceptance by appellee and sanctioned her signing and acknowledging the instrument. From the evidentiary standpoint this is sufficient upon which to base the conclusion that appellee was not in any respect imposed upon, nor was she coerced into signing the document, nor was she permitted by that faithful barrier of legal representatives to do any other than that which they deemed at the time to be fair, equitable and to her interest. This presence of counsel also negatives the inference or contention that she was incompetent to understand the arrangement, and was ignorant of its terms and did not know what she was doing. Hughes v. Leonard, 66 Colo., 500, 181 P., 200, 5 A. L. R., 817; Daniels v. Benedict, 8 Cir., 97 F., 367, 372, 381. From this latter opinion emanating from one of the ablest jurists in the United States, we take this excerpt made in commenting upon the participation of counsel representing the wife in the formation of a separation agreement:

"Mr. Wells conducted the negotiations of the applicant for this contract for five or six weeks before it was signed. His knowledge was the knowledge of his client, and no surer guaranty could be afforded to a court that an agreement was advisedly made with full knowledge of the financial standing and relations of the parties, and without fraud or undue influence, than the fact that it was prepared and advised by a lawyer of the character, caution, and ability which this record shows that Mr. Wells possessed."

 But it is said that this contract is unfair to appellee. There is nothing on its face so to indicate. It was not an immoral or an illegal or a pernicious agreement. Nor was it violative of public policy. It was entered into by two people of age and marital experience, each having been married before and both of them beyond the middle age period. It was made after they had had many years of disputes and wrangles and misunderstandings; after years of crimination and recrimination—years in which a jealous wife had

followed the trail and the doings of the husband with the eye of suspicion, and after years of financial troubles and controversies. So far as we can learn there was no concealment of a single fact, nor any misrepresentation of a fact, and no Damoclean sword kept hanging over the head of the wife during the negotiations. Hence the entire absence of any legal grounds upon which to base a decree annulling said contract. Such an agreement is within the category of contracts and is to be looked upon and enforced as an agreement, and is to be constituted as other contracts as respects its interpretation, its meaning and effect. Being such the courts are restrained from disregarding it and annulling it. North v. North, 339 Mo. 1226, 100 S. W. (2d) 582, 109 A. L. R., 1065. And when such contract is submitted to a court of equity for interpretation and enforcement, it must be construed by the rules of interpretation and remedies to be applied as any other contract. 17 Am. Juris., 549. Hence this agreement must be regarded as a contract, a settlement of disputes, a compromise and an arbitration.

 Another standpoint from which to view it is found in doctrine of election of remedies. Mrs. Matthews had the election to proceed with her bill in equity or to go into arbitration. Her able attorneys selected this arbitrament, and she should not be permitted to recede from it, especially after she had deliberately ratified it. Her attorneys were there not only as her legal representatives but as her advisers and assistants in the settlement, quasi judicial of the matters between her husband and herself.

 The learned Special Judge emphasized his conviction that the contract was unfair to appellee because of the meagerness of the allowance when contrasted with the great wealth of appellant. It may so appear. But we have yet to find any recent case wherein such agreements have been set aside the trial judges thought the allowance should have been more liberal upon the part of the husband. When closely examined it will be observed that the husband created a quasi trust for his wife by setting apart certain investments and making such provision as that she will throughout her life be protected, regardless of any misfortune that may befall him. Whether it should have been larger is a matter that ought not enter into this controversy. Appellee and her counsel, as we infer, were at the time content with the provision made for her, with full knowledge of the financial status of the husband. Under the authorities this is no ground upon which to annul such agreement, absent fraud or coercion. Daniels v. Benedict, supra, a case wherein the husband allotted to the wife about one-tenth of his estate. Walker v. Walker, 9 Wall., 743, 19 L. Ed., 814, 815; Sumner v. Sumner, 121 Ga., 1, 48 S. E., 727.

 In the case at bar the husband provides for the wife an estate approximating thirty per cent of his holdings. He gives guarantees of its maintenance throughout the life of the wife and

594

hedged it about in such a way as that nothing will diminish or impair that estate. Neither will it be absolved by taxes, nor will it collapse in the event of the destruction of capitalism in this country. It must be remembered that while a faithful wife is a help in the accumulation of wealth, the husband is the one who battles with the elements and faces the storm and assumes the risks of complete annihilation. The hazards of the throw of the dice which may lead to poverty are his. Hence the entire absence in our judgment of any basis upon which an inference of fraud from the smallness of the allowance can be drawn. Inadequacy of consideration is not of itself a basis for the rescission of contracts. It is only when the consideration is so meager as to shock the conscience that the courts may infer fraud, but the authorities are uniform that regardless of the consideration recited, there is no inference of fraud when the proof clearly shows that the contract was voluntarily and freely and understandingly entered into.

That separation agreements are valid in this jurisdiction has been established by two well considered opinions of this Court. We refer to Russell v. Russell, 3 Tenn. App., 232; Carroll v. Springer, 14 Tenn. App., 195. We need not go beyond these authorities; but we do refer to the illuminating opinions of the 8th Circuit Court of Appeals and the U. S. Supreme Court hereinabove referred to. Those august courts say that such agreements in such instances are to be preferred to legal controversies, and that when they are entered into they ought to be maintained.

It was suggested in the argument of learned counsel for appellee that there existed somewhat of a confidential relation between the contracting parties and that the burden rested upon appellant to show the fairness of the agreement. A sufficient answer is that in this instance there existed no relation of trust or confidence between the signers of the contract; that really there existed an attitude of hostility each to the other. This is a fact which takes the case beyond the category of contracts between parties between whom there was a relation of confidence, trust and dependence. Daniels v. Benedict, supra.

Another response to this contention that may be made is that the complaining party was represented and guided by independent counsel and advice both from trustworthy legal representatives and laymen. When such is the case the inference of fraud or undue advantage disappears. See Note, page 1505, 123 A. L. R. Moreover, there is no presumption of the invalidity of a contract between husband and wife in those States wherein the disabilities of coverture have been removed, except in very rare cases.

It is hard to discard the common law conception that the woman is the weaker vessel, and that her role in the drama of marriage is a passive one. This chivalric notion has been swept

away by our statutes. Man and wife are on an absolute equality in the legal sense with respect to adjustment of their property rights and differences. She may buy, sell, trade and traffic, give and take just as if she had never been married. Younger v. Gianotti (Tenn. Sup.), 138 S. W. (2d), 448, 128 A. L. R., 1413.

 Nor are courts at liberty to annul or change or amend a contract entered into by and between parties capable of contracting simply upon the ground that the judges may be of opinion that a better agreement would or should have been arrived at. 12 Am. Jur., 751; North v. North, supra; Russell v. Russell, supra.

 Bringing again to the fore our view that the meeting of the parties on April 14th may be assimilated to an arbitrating conference chosen as the means or medium of adjusting their property differences instead of carrying the controversy to the courts, Mrs. Matthews may be well held estopped to recede from that agreement in the absence of a clear showing of fraud or coercion. This court must indulge the presumption that she willingly accepted and definitely fixed and amply assured allotments rather than the hazards always attendant upon allowances that subsequent events may entirely sweep away.

We are of the opinion that the learned Special Chancellor therefore was in error when he declared the agreement invalid and awarded Mrs. Matthews $400 per month instead, and the assignments leveled at these portions of the decree are sustained.

The Chancellor was eminently right in refusing recognition to the Nevada divorce decree.

Having upheld the aforesaid agreement of April 14th, this latter instrument must be given its legal effect as the measure of the property rights of Mrs. Matthews in the estate of her husband. Russell v. Russell, supra; Carroll v. Springer, supra.

 We are reminded by able counsel for appellee that such a conclusion would in effect be awarding to appellant of advantages and benefits for his misconduct. As we understand the authorities, a validly executed agreement respecting maintenance will effectually deprive the wife of a decree for alimony as such. It is apparent to us that there is an ineradicable incompatibility between these parties; that they are so inharmonious in their relations as that reconciliation is not to be expected, and that it is better for them that a permanent separation take place as was contemplated by the contract of the aforesaid date. They are an ill-matched pair demonstrated by years of turmoil and bickering. Appellee herself has specially prayed that the separation be made permanent by decree. The husband contends that the provisions of the contract in this respect be upheld. Such agreements are enforced when deliberately made regardless of the question of the greater blame or fault. A decree in accordance with this opinion will be drawn and entered.

We have heretofore declared that the decree of the Chancellor taxing the costs against appellant including the fee allowed solicitors of appellee be affirmed; and now exercising our discretion, we direct that appellant also be taxed with the costs of this appeal; and it is accordingly so ordered.

Crownover and Felts, JJ., concur.