IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 20, 2017 Session

## MICHAEL LEE GIVENS v. TRISTINE ANN GIVENS

Appeal from the Circuit Court for Hamilton County
No. 12D1733     W. Jeffrey Hollingsworth, Judge

_____

No. E2016-00865-COA-R3-CV
_____

Michael Lee Givens ("Husband") sued Tristine Ann Givens ("Wife") for divorce. The case was tried, and the Circuit Court for Hamilton County ("the Trial Court") entered its order on January 12, 2016, *inter alia*, granting a divorce and distributing the marital property. Wife appeals raising issues regarding the classification and distribution of the marital property. We find and hold that the Trial Court erred in categorizing the real property located on Taggart Drive ("Taggart") as Husband's separate property. We, therefore, modify the categorization of Taggart to reflect that Taggart is marital property and remand this case for an equitable distribution of the marital estate taking Taggart into account as a marital asset. We affirm the remainder of the Trial Court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Modified, in part; Affirmed, in part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Elizabeth M. Hill, Chattanooga, Tennessee, for the appellant, Tristine Ann Givens.

W. Gerald Tidwell, Jr. and Todd A. Davis, Chattanooga, Tennessee, for the appellee, Michael Lee Givens.

# OPINION

## Background

Husband and Wife were married in December of 2002. No children were born of the marriage. Husband filed for divorce in August of 2012. The case was tried over multiple days in November and December of 2015. At the time of trial, Husband was 55 years old, Wife was 61 years old, and the parties had been married for thirteen years. Husband is employed as a real estate broker. Husband has worked in real estate for twenty-seven years. Wife is a teacher at an elementary school in the Catoosa County school system in Georgia. Wife has been teaching in Georgia for approximately thirty-six years.

Husband testified at trial about Taggart explaining that Taggart is rental property that he acquired in the summer of 1998, prior to the marriage. Wife's name never has been on the deed to Taggart. Husband and Wife never lived at Taggart.

Husband testified that Taggart was rented prior to the marriage and that it has remained rented during the marriage. Husband receives income from the rental of Taggart. Husband testified that Taggart generates $1,130 in income per month. He explained that Taggart is a duplex and that one of the units rents for $530 and the other rents for $600.

Husband stated that the purchase price of $78,000 for Taggart was financed 100 percent. At the time of the marriage, Husband owed around $70,000 on Taggart. Husband testified that the value of Taggart as of the date of the marriage was $78,000. In 2004, Husband refinanced Taggart and borrowed $72,000. At that time, Wife signed a deed of trust to relinquish any marital interest she had in that property. In 2012, during the marriage, Husband paid off Taggart. Husband stated that the value of Taggart at the time of trial was around $83,500.

Husband testified that Wife made no payments on Taggart. Husband stated: "They came strictly from the rental income. The rent was like 560, and it paid for itself, so I doubled the payments to pay it off quicker." When questioned further about how he paid the mortgage on Taggart, Husband stated:

> The rent. The rent was like five - - the payment's 560. The rent was anywhere from 1,000, then it raised to like 1,130, so I would just take the rent and make the payment with it. And then at one point I upped the payments up to 1,130 to pay it off quicker. I paid it off in eight years.

2

When Husband was asked if he paid Taggart off solely from the rents, he stated: "No. I sold Dr. Heinsohn two houses in 2012. One closed in May, one closed in June. I took the money from those and paid off the - - I think it was right at 29 to $30,000 off."

When questioned, Husband admitted that he spent $33,865 of his income during the marriage remodeling Taggart. Husband admitted that the taxes and insurance payments on Taggart came from his income during the marriage. Husband also stated that he paid the property taxes on Taggart, and that Wife never did so.

Husband testified that he managed Taggart. With regard to the maintenance of Taggart, Husband stated: "[Wife] went over one - - I think maybe two times when it came empty, we planted some shrubs and done some mulch out front. And then she actually cleaned the refrigerator out a couple of times."

Husband also testified about real property located at St. Lucie Court ("St. Lucie Court"). St. Lucie Court was acquired in April of 2010. Husband testified that St. Lucie Court is owned 50/50 between Husband and another couple, the Messiers. The deed to St. Lucie Court contains both Husband's and Wife's names along with Lisa Messier's name. Husband testified that $23,000 from the home equity line on the parties' marital residence, referred to by the parties as Mountain Shadows ("Mountain Shadows"), was the parties' portion of the purchase price of $157,500 for St. Lucie Court. Husband's understanding was that he and Wife would get 50% and the Messiers would get 50% when St. Lucie Court sold.

Husband receives income from the rental of St. Lucie Court. Husband testified that St. Lucie Court had been rented in the past, but was vacant at the time of trial. Husband stated that the mortgage payments for St. Lucie Court are paid by the renter and "drafted out of the Blue and Gold account." Husband testified that he does not pay anything on St. Lucie Court, but that he did when they first bought it because they were not charging as much in rent.

Husband testified that he planned to list St. Lucie Court for sale per his agreement with the Messiers as soon as the Trial Court allowed. He stated that the present market value of St. Lucie Court is the tax appraisal of $217,000. Husband plans to list the property for $220,000. Husband testified that the payoff on St. Lucie Court is $104,000. When asked how much he expected to receive from the sale of St. Lucie Court, Husband stated: "You'd take out probably 15 to 20,000 of closing costs, commissions, so it would probably get you netted somewhere around that 200 mark down, so probably about 80 to 90,000 equity is what I'm guessing." Husband hopes to receive around $50,000 as his and Wife's share.

3

Husband testified that Wife never paid the mortgage on St. Lucie Court. The St. Lucie Court mortgage payment is auto-drafted from an account the parties referred to as the Blue and Gold account ("Blue and Gold Account"). Husband stated that the mortgage on St. Lucie Court is "right at 800."

Husband testified that he and Tommy Messier began a partnership to "flip houses" in May of 2010. Husband referred to this partnership as the Blue and Gold Partnership ("Blue and Gold"). Husband stated that St. Lucie Court is not related to Blue and Gold even though St. Lucie Court money is deposited into the Blue and Gold Account. Husband testified that they purchased and sold two houses using Blue and Gold. Husband testified that they have not purchased a house since 2010 with Blue and Gold.

Wife loaned Husband $30,000 to put into Blue and Gold, and Tommy Messier put in $25,000. Husband testified, however, that Wife was not a partner of Blue and Gold. Husband testified that Wife loaned the money as an investment, and the arrangement was that she would be repaid when the houses sold.

Husband admitted that Wife is owed $30,000 from Blue and Gold. Husband stated that there was "[r]ight at 41,000" in the Blue and Gold Account at the time of trial. Husband stated that he has not repaid Wife because the Blue and Gold Account was frozen due to the pending divorce. Husband testified that the Messiers already have pulled $27,500 from the Blue and Gold Account as a return or refund on their investment.

Husband proposed splitting with Wife any excess amount remaining in the Blue and Gold Account after Wife is repaid the $30,000, and repairs are made to St. Lucie Court in order to sell it. Husband explained that St. Lucie Court was not rented at the time of trial so the money in the Blue and Gold Account will cover payments for a while, and then Husband and the Messiers will have to put money into St. Lucie Court. Husband anticipates getting $200,000 in equity from St. Lucie Court. When questioned, Husband acknowledged that a portion of the money from the sale of St. Lucie Court is Wife's money.

Husband was questioned about the home equity line of credit ("HELOC") on the parties' marital home, Mountain Shadows. He was asked about the purpose for the HELOC, and he stated it was "[t]o remodel homes. And a lot of those draws was on the two years [sic] taxes on St. Lucie, Sylvan Drive, Bermuda, and putting a roof on, that's what these were used for." Husband admitted that Wife never drew on the HELOC and that he is the only one who drew money from the HELOC. Husband was asked if he told Wife each time he drew on the HELOC, and he stated: "No. She knew I took stuff out to pay bills sometimes, or to buy something and pay it back." Husband admitted that the

HELOC monies were "both our monies." At the time of trial, the balance owed on the HELOC was $30,453.13.

Husband insisted that Wife knew he was refinancing the marital home. The HELOC had $30,453.13 drawn from it from December 30, 2010 until shortly after the divorce was filed. Husband admitted that he pulled all of this money out, Wife never took money from the HELOC. When asked, Husband could not say where that money went. He stated: "Probably to pay those taxes that I told you about on St. Lucie, Sylvan and Bermuda." When questioned further, Husband admitted that only $17,000 went to pay bills associated with the rental properties or the 'flip' properties. Husband was asked where the remaining $20,000 went, and he stated: "It could have been to pay bills." Husband admitted that after he filed for divorce in August of 2012, he continued to pull money from the HELOC. In December of 2012, Husband took $3,000 from the HELOC. In February of 2013, he took $2,500. During the rest of the pendency of the divorce, Wife froze the HELOC.

The balance on the HELOC in August of 2012 was $25,000. Husband filed for divorce in August 2012. Husband was asked if he drew another approximately $5,000 from the HELOC during the pendency of the divorce, and he stated: "It was probably for taxes, I'm guessing." Husband was asked if he told Wife he was drawing this money, and he stated: "She knew. She told me no, and that's where the money would come from." Husband admitted that he had attempted to draw more money from the HELOC during the divorce and discovered that Wife had frozen the HELOC.

In 2005, Husband purchased a 2002 Jaguar for around $44,000. He testified that the present value of the Jaguar was $4,896. Husband admitted that it was his idea to purchase a Jaguar, but he stated that Wife "was in on wanting [a convertible], too, . . . ." Husband admitted that he cannot use the Jaguar for business because it is a two seater, and he needs to transport clients. He stated: "It's just a fun car." Husband paid for the Jaguar using money from his bank account and money he took from the HELOC.

During the marriage Husband had a facelift. When asked about the facelift, Husband stated: "I had a high - - a brow and an eye lift. I had saggy eyelids where I wore contacts and pinched them, so I had them fixed. And when I was there, Dr. Chase said, let's just take four of your five chins off, so we did." Husband testified that he had the facelift in 2007.

Husband agreed that, for the most part, he had close to twice the income that Wife did during the last three tax return years. Husband admitted that Wife gave him substantial sums of money during the marriage. He also admitted that he received $21,300 in checks from Wife in 2011, and he pulled $24,000 from the HELOC. Husband

further admitted that Wife substantially contributed to his SunTrust checking account during the marriage. When questioned, Husband admitted that he purchased a new car, two dogs, and new clothes during the pendency of the divorce.

Brent McDade, a director in the business valuation and litigation support group with Elliott, Davis, Decosimo, testified as an expert witness for Husband. Mr. McDade valued Wife's retirement with the Teachers Retirement System of Georgia. He testified that Wife has the option to take a lump sum on her retirement, which he valued at $159,526.79 as of September 30, 2015. The marital portion of the lump sum valuation is $101,242.41. Mr. McDade also calculated a pension option for Wife's retirement, which he stated was "the much more attractive option financially, from [Wife's] point of view." Mr. McDade stated that under the pension option, Wife would receive $3,199.38 per month for the remainder of her life for an annual benefit of $38,399.80. Mr. McDade then calculated the present value of the pension option by making several assumptions including when the payments start, how long the payments would continue, and the return or "interest factor on the money as the payments move out into the future." He stated: "According to the Social Security Administration, [Wife] has 25.1 years of remaining life expectancy as we sit here today." Mr. McDade calculated a value for the pension option of $433,510, and explained: "Basically, we take each of the monthly payments that she would receive for the next 25.1 years and calculate its present value, its value today, and then add all of those together. And the result is the $433,510." Mr. McDade calculated the martial portion of the pension option as having a value of $174,741. Mr. McDade opined that it would be in Wife's best financial interest to retire from her job, begin collecting her pension, and then obtain a similar job elsewhere and collect a paycheck from the new job.

Randall Hebert, a partner with Henderson, Hutcherson and McCullough in Chattanooga, testified as an expert witness for Wife. Mr. Hebert is a Certified Public Accountant, a Certified Valuation Analyst, and a Certified Global Management Accountant. Mr. Hebert testified that he believes that the only fair way to calculate the value of Wife's retirement would be to wait until the day Wife retires and then award Husband a percentage based on the length of the marriage at that time. When asked about Mr. McDade's valuation of $433,510, Mr. Hebert stated that he believes the present value is around $220,000, which includes the entire years of service and not just the years of the marriage. Mr. Hebert stated that Mr. McDade's calculation relies upon the assumption that Wife will live "to each one of the ages, each one of these payments, in order to receive it," which he states is "highly unlikely." Mr. Hebert opined that the current value of Wife's retirement should be the lump sum option of approximately $159,000.

6

Wife testified at trial that she was not aware that Husband borrowed $88,000 from the HELOC. Wife could not recall any conversations she and Husband had about borrowing money from the HELOC. When the marital home, Mountain Shadows, was refinanced in 2010, there was a balance on the HELOC of $88,000. Wife was not aware of this fact at that time. Wife did not attend the closing of the refinance. Wife also was not aware that Husband took out another equity line[1] for $138,000 in January of 2011. Wife testified that until the divorce, she was not aware that Husband had drawn $37,000 from that equity line. Wife was asked if she knew what that money was spent on, and she stated:

> I don't know, because like you can't pay Peter with Paul. But there's a lot of money that has been put in places and - - I mean, he's got a huge retirement now. He didn't have any of that before we married. His duplex is paid off. Yet he says he's paid all the bills. It's obvious that's not true. I have no clue.

Wife stated: "when he filed for divorce and my attorney got the information, I was in shock, I didn't even know it was happening." During the pendency of the divorce, Wife took steps to freeze the HELOC. Wife testified that she never took anything from the HELOC.

Wife testified that she did not know that the Jaguar was going to be paid off from the HELOC. She testified that she agreed to the purchase of the Jaguar after Husband took her to see it. At that time, Wife did not know where the money to purchase the Jaguar came from. She stated: "I assumed that he - - I think he had said something about money he got, and I'm not sure what property, I'm not sure if it was the townhome, or a sale, or whatever, and I felt, okay, look here's this guy that wants this car, it's going to make him happy, and we're doing okay, so - - . . . ." Wife stated that she would not have allowed the use of the HELOC had she known "because we were supposed to be saving - - building up the equity to flip that home." Wife also was not aware that Husband took money from the HELOC for the down payment on St. Lucie Court.

Wife testified that she gave Husband money any time he asked except for one time when he wanted $24,000 for taxes. Wife stated: "I didn't understand [why we owed $24,000] because I've never had to pay that much money for taxes, and of course mine come out of [my paycheck withholding from employment as a school teacher], so I didn't understand it." Wife thought Husband was going to enter into some kind of a payment

---

[1] Although not completely clear, it appears that the original HELOC was paid off during the refinance and that post-refinance Husband opened a new HELOC. In this Opinion we refer to both equity lines as the 'HELOC' since both drew from equity on the marital residence, Mountain Shadows.

plan to pay the taxes over time. Wife stated: "I just couldn't see that [having to give Husband $24,000] was fair."

Wife testified that, in addition to helping to clean Taggart between renters, she purchased two ceiling fans and paint for Taggart. Wife heard that $36,000 in repairs were done to Taggart, and she stated that would have had to have been marital money because Husband did not have anyplace else from where he might have drawn the money. Wife stated that she and Husband had discussed that Taggart was going to be for a part of their retirement. Wife stated:

> And I worked on it with him, I was his - - we were a good team. I was willing to do a lot of hard work for him and his properties on a regular basis. And I feel like, if marital money was used to pay it off, it had to come from marriage, because you can't get the money out of [Husband's] paycheck to pay all his bills and pay all his properties and do everything, and then we need equity line money. But, you know, it's confusing to me.

Wife testified about her bank account known as the Catoosa Teachers Credit Union account. She testified that each month until 2013 or 2014, she would put $400 into this account. Wife stated that she had $45,000 in this account pre-marriage. At the time of trial, there was around $70,000 in this account. Wife asserted that $45,000 of this money is separate and that the balance over $45,000 is marital.

Wife also had a First Tennessee Bank savings account. At the time of trial the balance in that account was $57,432. Wife testified that the premarital balance of that account was $63,688.52. Wife testified that she told Husband when they married that she intended the money in the First Tennessee Bank account to go to her son if something happened to her. Wife testified that if she had money left over every month after paying bills she put it into her First Tennessee Bank account. Wife testified that she considers the money in her First Tennessee Bank account to be her separate property because the balance is essentially what it was pre-marriage. She stated: "I worked very hard to get there. I have grandchildren, I still have a[n adult] son." When questioned, Wife admitted that what she wants is to be put in the same position she was in before this 13 year marriage.

After trial, the Trial Court entered its Memorandum Order on January 12, 2016 granting a divorce and classifying and distributing the marital property. Both parties filed motions to alter or amend. By order entered March 30, 2016, the Trial Court revised its January 12, 2016 order to find that Wife's Catoosa Teachers Credit Union account was marital property to be distributed 60% to Wife and 40% to Husband. Wife appealed to this Court. We remanded the case for entry of a final order. Upon remand, the Trial

Court entered an order on November 4, 2016 distributing several marital assets and liabilities inadvertently omitted from the January 12, 2016 order and clarifying its distribution of St. Lucie Court and the Blue and Gold Account.

## Discussion

Although not stated exactly as such, Wife raises three issues on appeal: 1) whether the Trial Court erred in ignoring the parties' alleged agreement with regard to St. Lucie Court and the Blue and Gold Account; 2) whether the Trial Court erred in classifying Wife's bank accounts as marital property; and, 3) whether the Trial Court erred in classifying Taggart as Husband's separate property. Husband raises two additional issues, which we restate as: 1) whether the Trial Court erred in its application of Tenn. Code Ann. § 36-4-121(c); and, 2) whether the Trial Court erred in valuing Wife's retirement account.

Our review is de novo upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). A trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Kelly v. Kelly*, 445 S.W.3d at 692.

The issues raised in this appeal concern the classification of property as either separate or marital and the distribution of the marital property. As our Supreme Court has instructed:

> Tennessee is a "dual property" state because its domestic relations law recognizes both "marital property" and "separate property." *See generally* Tenn. Code Ann. § 36–4–121; *Eldridge v. Eldridge*, 137 S.W.3d 1, 12 (Tenn. Ct. App. 2002). When a married couple seeks a divorce, the "marital property" must be divided equitably between them, without regard to fault on the part of either party. Tenn. Code Ann. § 36–4–121(a)(1). "Separate property" is not part of the marital estate and is therefore not subject to division. *See Cutsinger*, 917 S.W.2d at 241. Thus, it is imperative that the parties, the trial court, or both identify all of the assets possessed by the divorcing parties as either marital or separate so that a proper division can be accomplished.

*Snodgrass v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009).

9

Courts must look to Tenn. Code Ann. § 36-4-121 when determining how to categorize and distribute property in a divorce. In pertinent part, Tenn. Code Ann. § 36-4-121 provides:

(b) For purposes of this chapter:

(1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing . . . and valued as of a date as near as reasonably possible to the final divorce hearing date. . . .

(B) "Marital property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, . . . .

* * *

(D) As used in this subsection (b), "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine.

* * *

(2) "Separate property" means:

(A) All real and personal property owned by a spouse before marriage;  . . ..

* * *

(c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties. . . .

Tenn. Code Ann. § 36-4-121 (2014).

A trial court has wide discretion in dividing the interest of the parties in marital property. *Barnhill v. Barnhill*, 826 S.W.2d 443, 449 (Tenn. Ct. App. 1991). As noted by this Court in *King v. King*, when dividing marital property:

> The trial court's goal in every divorce case is to divide the parties' marital estate in a just and equitable manner. The

11

division of the estate is not rendered inequitable simply because it is not mathematically equal, *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn. 1988), or because each party did not receive a share of every item of marital property. *Brown v. Brown*, 913 S.W.2d [163] at 168. . . . In the final analysis, the justness of a particular division of the marital property and allocation of marital debt depends on its final results. *See Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. App. 1990).

*King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998) (quoting *Roseberry v. Roseberry*, No. 03A01-9706-CH-00237, 1998 Tenn. App. LEXIS 100, at *11-12 (Tenn. Ct. App. Feb. 9, 1998), *no appl. perm. appeal filed)*.

We first consider whether the Trial Court erred in ignoring the parties' alleged agreement with regard to St. Lucie Court and the Blue and Gold Account. As this Court has noted:

A property settlement agreement between a husband and wife is

within the category of contracts and is to be looked upon and enforced as an agreement, and is to be construed as other contracts as respects its interpretation, its meaning and effect. Being such the courts are restrained from disregarding it and annulling it. And when such contract is submitted to a court of equity for interpretation and enforcement, it must be construed by the rules of interpretation and remedies to be applied as any other contract.

*Matthews v. Matthews*, 24 Tenn. App. 580, 593, 148 S.W.2d 3, 11–12 (1940) (citations omitted).

Courts are not "at liberty to annul or change or amend a contract entered into by and between parties capable of contracting simply upon the ground that the judges may be of opinion that a better agreement would or should have been arrived at." *Id*. at 595, 148 S.W.2d at 13 (citations omitted).

*Bruce v. Bruce*, 801 S.W.2d 102, 105 (Tenn. Ct. App. 1990).

In her brief on appeal, Wife asserts that the Trial Court failed to classify St. Lucie Court as either separate property or marital property and "mistakenly conflated the Blue and Gold Partnership account with the St. Lucie Court house . . . ." Wife also asserts that the parties had an agreement with regard to the distribution of St. Lucie Court and the Blue and Gold Account. Wife is mistaken.

First, we note that the record on appeal shows that St. Lucie Court and the Blue and Gold Account are separate assets and that the Trial Court correctly classified each of these assets as marital property in its January 12, 2016 Memorandum Order. In the January 12, 2016 Memorandum Order, the Trial Court first listed each party's separate property. The Trial Court then, under the heading of marital property, discussed the individual pieces of martial property, including St. Lucie Court and the Blue and Gold Account, and the distribution assigned to each piece of marital property. The Trial Court further took steps to clarify its classification and distribution of St. Lucie Court and the Blue and Gold Account in its November 4, 2016 order. We find no error in the Trial Court's classification of St. Lucie Court as marital property. Nor do we find any error in the Trial Court's classification of the Blue and Gold Account as marital property.

Second, a careful and thorough review of the record on appeal reveals that although the parties proposed similar distributions with regard to St. Lucie Court and the Blue and Gold Account, they did not enter into any stipulations or property settlement agreements, which could be considered contracts, with regard to the marital assets.

A trial court is charged with classifying property in a divorce as marital or separate and with making an equitable division of the entire marital estate. A trial court is not bound to follow distributions proposed by the parties when making an equitable division of the marital property. Had the parties wished to enter into a property settlement agreement, they were free to do so. They did not do so in this case. As such, the Trial Court did not err in making a distribution of St. Lucie Court and the Blue and Gold Account that was different than the one proposed by the parties. The fact that a party to a divorce does not receive an "equitable" portion of each and every marital asset does not make the overall distribution of the marital estate inequitable. A trial court is charged not with making an equitable division of each spearate marital asset but rather with making an equitable division of the entire marital estate. This issue is without merit.

Next, we consider whether the Trial Court erred in classifying Wife's bank accounts as marital property. Our Supreme Court discussed the concepts of marital property and separate property in *Langschmidt v. Langschmidt* and noted that in addition to the statutory provisions contained in Tenn. Code Ann. § 36-4-121(b), Tennessee intermediate appellate courts have recognized two methods by which separate property may be converted into marital property. *Langschmidt v. Langschmidt*, 81 S.W.3d 741,

13

747 (Tenn. 2002). These two methods are commingling and transmutation, which the Supreme Court noted have been described by this Court as follows:

> [S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur. . . . [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. . . . The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Langschmidt*, 81 S.W.3d at 747 (citations omitted).

In her brief on appeal, Wife asserts that the Trial Court erred in classifying her Catoosa Teachers Credit Union account ("Catoosa Account") and her First Tennessee Bank account ("First TN Account") as marital property. With regard to the Catoosa Account, the Trial Court specifically found that: "It appears to the Court that constant deposits of marital funds into this account throughout the marriage and the withdrawal of significant funds by the Wife while the parties were still married, created a comingling of funds so that the Catoosa Teachers Credit Union account became marital." The evidence in the record on appeal does not preponderate against this finding.

As for the First TN Account, the Trial Court specifically found: "The Wife's account at 1st Tennessee Bank has less in it at the time of trial than it did before the marriage. The testimony was clear that the Wife contributed marital funds to that account and withdrew funds from it to help pay marital bills and expenses." Based on this finding, the Trial Court found the balance of this account to be a marital asset. The evidence in the record on appeal does not preponderate against this finding.

The evidence in the record on appeal shows that Wife deposited significant marital funds and paid marital bills out of both the Catoosa Account and the First TN Account during the marriage causing the monies in both of these accounts to become comingled with marital funds. We find no error in the Trial Court's classification of the Catoosa Account and the First TN Account as marital property.

14

We turn now to Wife's issue regarding whether the Trial Court erred in classifying Taggart as Husband's separate property. The evidence in the record on appeal shows that Taggart was acquired by Husband pre-marriage. Thus, Taggart would be classified as Husband's separate property unless the evidence showed that Taggart was converted into marital property through transmutation.

Husband testified that Taggart was rental property that paid for itself and that Wife never contributed toward Taggart in any significant manner. Husband, however, admitted that he paid off the mortgage owed on Taggart during the marriage and that he used marital funds that he earned during the course of the marriage to do so, at least in part. Specifically, Husband testified that at the time the parties were married, the debt on Taggart was approximately $70,000, and that during the marriage he took income he earned from selling two houses and paid off "right at 29 to $30,000 . . ." on Taggart. Husband also admitted that he spent $33,865 of his income during the marriage remodeling Taggart. The preponderance of evidence in the record on appeal shows that Husband transmutted Taggart into marital property when he expended these significant amounts of marital income on paying off and remodeling Taggart. Thus, a rebuttable presumption of a gift to the marital estate was created, and that presumption was not rebutted.

We find and hold that Taggart is marital property. As such, we modify the Trial Court's judgment to reflect that Taggart is marital property, not Husband's separate property, and we remand this case to the Trial Court for an equitable distribution of the martial estate taking into account Taggart as marital property.

Having addressed the issues raised by Wife, we now consider the issue raised by Husband regarding whether the Trial Court erred in its application of Tenn. Code Ann. § 36-4-121(c). Husband asserts in his brief on appeal that the Trial Court reached the wrong conclusion with regard to several specific factors contained in Tenn. Code Ann. § 36-4-121(c). In essence, Husband argues that the Trial Court should have weighed the factors contained in Tenn. Code Ann. § 36-4-121(c) differently and then distributed the marital property using a 50/50 split.

As our Supreme Court has reiterated: "Section 36–4–121(a)(1) requires an *equitable* division of marital property, not an *equal* division." *Larsen-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010). In essence, Husband is requesting this Court tweak the Trial Court's distribution of the marital estate. We decline to do so. The record on appeal reveals that the Trial Court considered all of the relevant factors contained in Tenn. Code Ann. § 36-4-121(c), and we find no reversible error in the Trial Court's application of these factors to the evidence presented to the Trial Court. This issue is without merit.

Finally, we consider Husband's issue regarding whether the Trial Court erred in valuing Wife's retirement account. In his brief on appeal, Husband argues that the Trial Court erred in not accepting the pension value that his expert opined for Wife's retirement stating that his expert's "testimony was guided by a review of the relevant case law . . . ." Husband's entire argument with regard to this issue has to do with the fact that his expert was familiar with case law, and Wife's expert "neither reviewed *Snodgrass* nor was familiar with the case," and "had also never testified concerning this issue in court before." Husband, however, points to nothing that suggests that Wife's expert was unqualified to offer an expert opinion on the issue at hand. Furthermore, we note that Mr. McDade, Husband's expert, testified that the lump sum option of Wife's pension was valued at $159,526.79 as of September 30, 2015, making the marital portion $101,242.41. In its January 12, 2016 order, the Trial Court found, given the evidence in this case, that the lump sum payment was "the best method to determine [the] value [of Wife's retirement]" and that the sum was $159,526.79 making the marital portion $101,242.39. Thus, the value assigned to Wife's pension was within pennies of the lump sum value as testified to by Husband's expert. This issue is without merit.

We modify the Trial Court's judgment to reflect that Taggart is marital property, and we remand this case to the Trial Court for an equitable distribution of the marital property in light of our reclassification of Taggart as marital property.

## Conclusion

The judgment of the Trial Court is modified to reflect that Taggart is marital property, and this cause is remanded to the Trial Court for further proceedings in compliance with this Opinion and for collection of the costs below. We affirm the remainder of the Trial Court's judgment. The costs on appeal are assessed against the appellee, Michael Lee Givens.

_____
D. MICHAEL SWINEY, CHIEF JUDGE